Frank **RODGERS**, Appellant,

v.

**COMMONWEALTH of Kentucky,** **Appellee.**

No. 2007–SC–000040–MR.

Supreme Court of Kentucky.

June 25, 2009.

Daniel T. Goyette, Louisville Metro Public Defender, Bruce P. Hackett, Deputy Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Frank Rodgers appeals as a matter of right from a November 22, 2006 Judgment of the Jefferson Circuit Court convicting him of first-degree manslaughter and sentencing him as a second-degree persistent felon to twenty years in prison. The Commonwealth alleged that shortly after midnight on August 22, 2004, Rodgers and his co-defendant, Deshawn Eddings, shot and killed Dewhon McAfee in the course of an altercation that erupted in the backyard of McAfee's home on South 28th Street in Louisville. Two eyewitnesses identified Rodgers and Eddings as McAfee's assailants, and Rodgers himself, in his post-arrest statement to Louisville Metro Police Detective Leigh Whelan, admitted having shot at McAfee, but claimed that he did so in self-defense and without intending to kill. On appeal, Rodgers contends (1) that he was entitled to be tried separately from Eddings; (2) that the trial court misapplied the law of self-defense; (3) that one of the Commonwealth's peremptory juror strikes violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (4) that the petit jury was not chosen from a fair cross section of the community; and (5) that the jury instructions understated the Commonwealth's burden of proof and commented on Rodgers's silence. Finding no reversible error, we affirm.

### RELEVANT FACTS

The Commonwealth's case rested largely on the testimonies of two of McAfee's friends, Myrna Palmore and Tamara Eubanks. They testified that on the evening of August 21, 2004, they joined McAfee for a barbeque in his backyard and that later in the evening Eubanks, who was familiar with Rodgers and Eddings, invited them to join the get-together. Rodgers and Ed-

dings, who claimed not to know McAfee, arrived at McAfee's house at some time between approximately 10:30 and 12:00. At first, according to the women, everything seemed fine. Rodgers and Eddings may have had some food and some beer, and they smoked some marijuana with the two women while everyone talked and listened to music.

Not long after midnight, however, according to Palmore, Eubanks went into the house briefly and while she was gone McAfee suddenly stood up and angrily asked Rodgers, "What did you say to me?" A heated argument ensued between the two men. Palmore testified that McAfee threatened to "whup" Rodgers, at which point she got between them and urged McAfee to calm down. Eubanks testified that she returned to the backyard to find McAfee and Rodgers arguing and that she joined Palmore, who was standing between the men, urging Rodgers to leave. During the argument Rodgers apparently backed out of the backyard and along the side of the house toward the front. When he had nearly reached the front yard, both men shoved the women aside and, according to Palmore and Eubanks, Rodgers produced a gun and fired several shots at McAfee. Palmore remembered four to eight shots; Eubanks remembered five. A neighbor who overheard the arguing testified that she heard three shots in rapid succession. Eubanks testified that McAfee fell to the ground and that Eddings, who had remained toward the back of the house during the argument, then came forward, pulled out a gun, and fired two additional shots at the prone McAfee. Palmore testified, however, that McAfee remained standing until Eddings produced a gun and shot at him from behind. According to the women, Rodgers and Eddings then both drove away in Rodgers's car. McAfee died at the hospital later that morning.

The medical examiner testified that McAfee had been shot three times, twice superficially—in the lip and in the shoulder—and once fatally. The fatal shot entered McAfee's lower left side, punctured his stomach and diaphragm, and exited his right side. The examiner recovered one of the bullets, which, according to ballistics experts, matched either of the two 9 mm shell casings found at the scene.

The Commonwealth also introduced portions of the statements Eddings and Rodgers gave to Detective Whelan upon their arrest. Prior to trial the statements were redacted in an attempt to comply with the dictates of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). With respect to both defendants, Detective Whelan quoted or paraphrased from the redacted versions. During Eddings's police interview, he admitted being present at the time of the shooting, admitted that Rodgers and McAfee argued, and admitted that he heard gunfire and saw flashes from the barrel of a gun. He denied, however, firing any shots himself, claimed not to know whether Rodgers had used a gun, denied that either he or Rodgers had had a gun, and denied leaving with Rodgers after the shooting, claiming that he ran from the scene on foot. Based on Eddings's redacted statement, Detective Whelan testified simply that Eddings told her he had been present, had heard an argument, and had heard and seen gunfire. On cross-examination by Eddings, she admitted that Eddings had denied firing any shots.

During Rodgers's interview, he admitted being present, admitted arguing with McAfee, and admitted shooting at McAfee, but he claimed that McAfee was the aggressor and that he did not know what had sparked McAfee's anger. He further claimed that at the height of the argument McAfee had produced a gun that they had

wrestled over it, that he had succeeded in wresting the gun away from McAfee, that the gun had gone off once by accident and that he had then fired at McAfee's legs in an attempt to deter McAfee's assault. He and Eddings had then fled the scene in Rodgers's car, and he (Rodgers) had disposed of the gun in an alley. During her direct examination, Detective Whelan limited her testimony to Rodgers's admissions without his self-defense qualifications, but on cross-examination Rodgers was permitted to elicit his description of the struggle for the gun and his claim that he shot only once at McAfee's legs.

Neither Rodgers nor Eddings testified, but in closing argument Rodgers argued that he shot at McAfee in self-defense and under extreme emotional disturbance. Eddings argued that he had not shot at all. The jury instructions reflected those defenses. As noted, the jury found Rodgers guilty of first-degree manslaughter. It could not reach a verdict as to Eddings. In exchange for Rodgers's agreement to testify at Eddings's retrial, the thirty-year enhanced sentence recommended by the jury was reduced to twenty years.

### ANALYSIS

### I. The Trial Court Did Not Abuse Its Discretion by Joining Rodgers's and Eddings's Trials.

Rodgers's first contention on appeal is that he was entitled to be tried separately from Eddings and that their joint trial was rendered unfair by the use of their redacted statements. The use of Eddings's statement, he maintains, deprived him of his right to cross-examine adverse testimony, and the use of his own statement deprived him of his right to present a defense. The use of neither statement entitles Rodgers to relief.

■ Rule of Criminal Procedure (RCr) 6.20 permits the joinder for trial of two or more defendants if "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Joint trials are a mainstay of our system, as they give the jury the best perspective on all the evidence and thus increase the likelihood of proper verdicts and avoid the possibility of inconsistent ones. Conflicting versions of what happened, we have thus noted, "is a reason for rather than against a joint trial." *Shepherd v. Commonwealth*, 251 S.W.3d 309, 313 (Ky.2008) (quoting from *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003)). RCr 9.16, on the other hand, requires that trials be severed "if it appears that a defendant or the Commonwealth is or will be prejudiced" by the joinder. We review a trial court's denial of a motion to sever under the abuse of discretion standard. *Shepherd, supra.*

### A. The Introduction of Eddings's Redacted Admissions Did Not Require Severance or Deprive Rodgers of a Fair Trial.

■ As noted, Rodgers sought severance on two grounds. He argued first that the Commonwealth's use of Eddings's statement to Detective Whelan would violate his (Rodgers's) Confrontation Clause right to cross-examine adverse testimony. He correctly observed that in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that an unavailable declarant's out-of-court testimonial statement offered against a defendant is admissible only if the defendant has had a prior opportunity to cross-examine the declarant. In the context of a joint trial, therefore, "the pretrial confession of one [defendant] cannot be admitted against the other unless the confessing defendant takes the

stand." *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Indeed, the pretrial confession may not even be introduced against the confessor, the Supreme Court held in *Bruton, supra,* if on its face it implicates another defendant being jointly tried with the confessor.

■ If, however, the confession is redacted so as to remove all reference to the co-defendant(s), including obvious inferential references, then the confession may be admitted against the confessor. *Richardson, supra; Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). Thus *Richardson* concluded that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211, 107 S.Ct. 1702. Under these latter cases, the Commonwealth proposed to redact Eddings's statement so as to remove all reference to Rodgers and to introduce the statement against Eddings alone.[1] The trial court agreed that Eddings's redacted statement could be used against him and thus did not provide Rodgers with a ground for severance. Rodgers now argues that with *Crawford* the United States Supreme Court implicitly overruled *Richardson* and *Gray,* and further argues that even if *Richardson* and *Gray* survive, Eddings's redacted statement still implicated Rodgers, and thus did not meet the standard of admission established in *Gray.* Neither argument entitles Rodgers to relief.

First, we agree with the trial court that *Crawford* did not implicitly overrule *Richardson* and *Gray.* If the Supreme Court had intended such a major departure from its recent precedent it would have said so expressly and not left it to implication.[2] Simply put, *Crawford* and its progeny address the use of testimonial hearsay against a non-declarant. Thus, in this case, if Myrna Palmore, a mere witness and not a co-defendant, had provided a statement to police but was unavailable to testify at trial and had not been previously available for cross-examination, *Crawford* would have precluded admission of her "testimonial hearsay" against Eddings and Rodgers. However, *Crawford* and its progeny do not address the use of a prior testimonial statement against the declarant himself, the question addressed in *Bruton, Richardson,* and *Gray* and the issue presented here when Eddings's statement was introduced against Eddings himself in a joint trial. We agree with the several courts that have held that this latter question continues to be controlled by the *Bruton* line of cases and that "[t]he same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.'" *People v. Stevens,* 41 Cal.4th 182, 59 Cal.Rptr.3d 196, 158 P.3d 763, 776 (2007) (*quoting from United States v. Chen,* 393 F.3d 139 (2nd Cir.2004)). *See also United States v. Ramos–Cardenas,* 524 F.3d 600 (5th Cir.2008) (collecting cases). In reaching this conclusion, we note that joint trials differ from single defendant trials in at least one crucial way; the prosecution may offer certain items of evidence to be considered against only one of the defendants

---

1. The trial judge did not issue the limiting instruction referred to in *Richardson* informing the jury to consider the statement only against Eddings and not against Rodgers. We have held, however, that such an instruction is required only upon request. *Caudill v.*

*Commonwealth,* 120 S.W.3d 635 (Ky.2003). Because Rodgers does not claim to have made such a request, no error occurred.

2. Notably, Justice Scalia authored both *Crawford* and *Richardson.*

on trial just as Eddings's statement was offered only against him and not against Rodgers. Where a jury hears a non-testifying co-defendant's statement to be considered only against that particular defendant/declarant, both the redaction and the limiting instruction to the jury which Justice Scalia discussed in *Richardson* insure compliance with *Crawford*, *i.e.*, facially incriminating matters are removed and even if inferentially incriminating statements remain the admonition is presumed to be followed so that the testimonial hearsay is not being used against the defendant(s) who did not make the statement. The combination of redaction and limiting instruction satisfies *Crawford*. As previously noted, Rodgers did not request, and therefore waived, a limiting instruction.

Alternatively, Rodgers maintains that the redacted statement here did not meet the *Richardson/Gray* standard. In *Gray*, the Supreme Court held that in a joint trial, for a pre-trial statement to be admissible against a defendant/declarant under *Richardson*, the statement must be redacted so as to remove not just express reference to any other defendant, but also indirect references, such as omissions from the statement, which "obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." 523 U.S. at 196, 118 S.Ct. 1151. Rodgers contends that although Eddings's statement was redacted to remove any express reference to Rodgers, the portions of Eddings's statement introduced at trial wherein he admitted that he traveled by car to McAfee's house and that he witnessed an argument and heard and saw gunfire, obviously imply the existence of a driver and a shooter and point immediately, in this two defendant case, to Rodgers as the unnamed individual who occupied those roles.

■ We need not decide, however, whether the admission of these portions of Eddings's statement amounted to a *Bruton* error, for even if it did, *Bruton* errors are subject to harmless error analysis, *Shepherd, supra*, and any error here was clearly harmless beyond a reasonable doubt. *Sparkman v. Commonwealth*, 250 S.W.3d 667 (Ky.2008) (applying the "harmless beyond a reasonable doubt" standard to a Confrontation Clause violation). Not only did Palmore and Eubanks testify that Rodgers drove to McAfee's house, argued with McAfee, and shot at him, but Rodgers's own statement included the same admissions. Eddings's statement, therefore, even if its redaction was insufficient to remove all facial implication of Rodgers, as required by *Gray*, was harmlessly cumulative and so does not entitle Rodgers to relief.

**B.** **The Limited Introduction of Rodgers's Redacted Statement Did Not Infringe Upon His Right to Present a Defense.**

Rodgers also sought severance on the ground that the Commonwealth's proposed use of his own statement threatened to violate his right to present a defense. To the extent that Rodgers's contention is based on the redaction from his statement of any reference to Eddings and thus on his inability to use the statement to point the finger at Eddings, we rejected such a contention in *Shepherd, supra*. That is not the real thrust of Rodgers's contention, however.

The Commonwealth proposed to present to the jury Rodgers's admission that he shot at McAfee, but not to present those portions of his statement wherein he described the shooting as the culmination of an assault initiated by McAfee and a struggle over McAfee's gun. Rodgers argued

that on cross-examination of Detective Whelan, who would introduce Rodgers's "I shot at him" admission, he should be permitted to elicit the self-defense portions of his statement.

Obviously, this is not truly a severance issue, as the same question would have arisen even had Rodgers been tried alone. Nevertheless, although not preserved by Rodgers's severance motion, the issue was preserved during trial when Detective Whelan did indeed testify that Rodgers admitted shooting at McAfee, and over Rodgers's objection the trial court limited Rodgers's cross-examination to the following portion of his statement, the portion that contained the admission:

> Rodgers: So I was standing here. He just ran up and grabbed me, and like wrestling. Then all of a sudden, he came out, seemed like he had a gun here. Then we was like wrestling over the gun. I remember that. I was like, "Man, get off of me, man; just get off of me, man. I don't want no problems. I'm trying to leave, man, get off me." Then the gun just went off.
>
> Whelan: Okay.
>
> Rodgers: Boom! I heard one shot, and I didn't know where it came to. I was protecting myself. I didn't know if I was hit.
>
> Whelan: Um-hmm.
>
> Rodgers: We was wrestling, and [he] had me. Somehow I managed to grab the gun out of his hand, and, I just remember, I yanked it back, like that.
>
> Whelan: Okay.
>
> Rodgers: And I shot at his leg.
>
> Whelan: Okay.

Rodgers contends that he should have been permitted to ask the detective about other self-defense portions of his statement, portions, for example, in which he claimed that McAfee threatened to kill him and in which he described himself as terrified by McAfee's assault. We disagree.

■ As the Commonwealth noted during trial, the statements Rodgers made during his interrogation were inadmissible hearsay—admissible when offered by the Commonwealth as admissions of a party opponent under KRE 801(A)(b), but not admissible when offered by Rodgers himself. Rodgers argued, however, that KRE 106, the so-called rule of completeness, trumped the hearsay rule in this instance and permitted him to introduce those portions of his statement which would place the portion introduced by the Commonwealth into context and so prevent an unfair use of his "I shot at him" admission. We addressed this situation in *Schrimsher v. Commonwealth*, 190 S.W.3d 318 (Ky. 2006), where we explained that

> a party purporting to invoke KRE 106 for the admission of otherwise inadmissible hearsay statements may only do so to the extent that an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning.... The completeness doctrine is based upon the notion of fairness—namely, whether the meaning of the included portion is altered by the excluded portion. The objective of that doctrine is to prevent a misleading impression as a result of an incomplete reproduction of a statement. *This does not mean that by introducing a portion of a defendant's confession in which the defendant admits the commission of the criminal offense, the Commonwealth opens the door for the defendant to use the remainder of that out-of-court statement for the purpose of asserting a defense without subjecting it to cross-examination.*

190 S.W.3d at 330–31 (emphasis in original). The trial court did not abuse its

discretion under KRE 106 in this case. By permitting Rodgers to introduce that portion of his statement quoted above, the portion which actually contained the "I shot at him" statement which the Commonwealth introduced, the court allowed him to complete what was arguably an incomplete and potentially misleading reproduction of that statement. By excluding Rodgers's other exculpatory statements, on the other hand, the court correctly limited the introduction of an uncross-examined defense. As explained in *Schrimsher*, this was a permissible balancing of the hearsay and completeness rules.

On appeal, Rodgers further contends that the Due Process Clause of the United States Constitution also trumps the hearsay rule and that fundamental fairness required that he be allowed to introduce the exculpatory portions of his statement to Detective Whelan. He relies on *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), in which the Supreme Court held that in certain "circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S.Ct. 1038.

At issue in *Chambers* was the exclusion of certain statements by a non-defendant who had repeatedly admitted to friends and colleagues that he had committed the murder for which the defendant was on trial. The trial court excluded those statements as hearsay. The Supreme Court reversed, explaining that because the hearsay statements were "critical evidence" for the defense and the circumstances under which the statements were made "provided considerable assurance of their reliability,"

their exclusion violated due process. *Id.* at 300–02, 93 S.Ct. 1038.

Because Rodgers did not raise the *Chambers* issue at trial, our review is limited to determining whether the exclusion of his additional exculpatory statements amounted to palpable error. RCr 10.26. It did not. Rodgers's hearsay statements were not critical to his defense, since he was free to testify on his own behalf if he so desired, and unlike the third-party confession in *Chambers,* which in that case was clearly against the penal interest of the confessor, Rodgers's self-excusing statement to police was not made under circumstances giving "considerable assurance of [its] reliability." On the contrary, Rodgers evaded arrest for some three months after the shooting, by which time he had had ample opportunity to fabricate a defense, a circumstance underscoring the need for cross-examination of his self-defense claims, not establishing the propriety of dispensing with it. We have considered Rodgers's other unpreserved arguments and find them similarly inapt. The trial court did not err, in other words, by excluding any additional exculpatory portions of Rodgers's statement to Detective Whelan, nor, as discussed above, did it abuse its discretion by denying Rodgers's motion for a separate trial.

## II. The Trial Court Correctly Limited Application of the 2006 Self–Defense Amendments.

Effective July 12, 2006, after Rodgers's alleged 2004 crime but before his September 2006 trial, the Kentucky General Assembly joined a trend urged by the National Rifle Association and, through Senate Bill 38, extensively amended the self-defense [3] provisions of KRS Chapter

---

**3.** In addition to self-defense, the 2006 amendments relate to defense of others, defense of property and other justified uses of force.

For ease of reference, these various types of justified force will be referred to as "self-defense."

503. *See generally* Renee Lerner, *The Worldwide Popular Revolt Against Proportionality in Self–Defense Law*, 2 J.L. Econ. & Pol'y 331 (2006); Daniel Michael, *Florida's Protection of Persons Bill*, 43 Harv. J. on Legis. 199 (2006). Among other changes Senate Bill 38 created presumptions that one "unlawfully and by force" entering a dwelling, residence, or occupied vehicle does so with the intent to commit an unlawful act involving force or violence, KRS 503.055(4), and that a person encountering such an intruder reasonably fears death or great bodily injury. KRS 503.055(1). It expanded the circumstances in which the use of deadly force is justified to include those instances when one reasonably believes that such force is necessary to prevent the commission of a felony involving the use of force. KRS 503.050(2). The bill expressly provided that the right to use force, including deadly force, in defense of self or others is not contingent upon a duty to retreat. *See, e.g.* KRS 503.050(4), KRS 503.070(3). Moreover, the bill declared that one who justifiably used defensive force "is immune from criminal prosecution," including arrest, detention, charge, or prosecution in the ordinary sense. KRS 503.085(1).

Pursuant to this latter provision, Rodgers claimed immunity from prosecution, moved to have the charges against him dismissed, and sought an evidentiary pretrial hearing to address the immunity question. Denying Rodgers's motion to dismiss, the trial court ruled that the new immunity statute did not apply retroactively to Rodgers's case but that even if it did a review of the discovery record was sufficient to determine that Rodgers's assertion of self-defense was significantly

controverted, precluding his immunity. Rodgers contends that these rulings were incorrect: that the new self-defense legislation does apply retroactively and that he was entitled to an evidentiary hearing to address his assertion of immunity. Although we agree with Rodgers that the immunity statute (KRS 503.085) applied to his trial, the trial court appropriately addressed the immunity question and otherwise correctly determined that the new self-defense laws do not apply retroactively.

## A. The Substantive Provisions of the 2006 Self–Defense Law Apply Prospectively Only.

As the parties correctly note, our savings statute, KRS 446.110, one of the oldest statutes carried forward into the current Kentucky Revised Statutes,[4] provides in pertinent part that

> [n]o new law shall be construed to repeal a former law as to any offense committed against a former law, . . . or in any way whatever to affect any such offense or act so committed or done, . . . before the new law takes effect, except that the proceedings thereafter had shall conform, so far as practicable, to the laws in force at the time of such proceedings. If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect.

This statute marks a departure from the common law, under which the repeal of a statute describing a criminal offense precluded prosecution for outstanding violations of the statute which had occurred prior to repeal. *Commonwealth v. Louis-*

---

4. The savings statute appears to have been first enacted in about 1851, borrowed from the Virginia Revision, and included at chapter 21, section 23 in our Revised Statutes of 1852.

*ville & N.R. Co.,* 186 Ky. 1, 215 S.W. 938 (1919). Under KRS 446.110, unless the General Assembly unmistakably intends otherwise, substantive changes to criminal statutes will not be retroactively applied and "offenses committed against the statute before its repeal, may thereafter be prosecuted, and the penalties incurred may be enforced." *Lawson v. Commonwealth,* 53 S.W.3d 534, 550 (Ky.2001) (citation and internal quotation marks omitted). Substantive amendments are those "which change and redefine the out-of-court rights, obligations and duties of persons in their transactions with others." *Commonwealth of Kentucky Department of Agriculture v. Vinson,* 30 S.W.3d 162, 168 (Ky. 2000). By contrast, procedural amendments—"[t]hose amendments which apply to the in-court procedures and remedies which are used in handling pending litigation" *id.* at 168–69—*are* to be retroactively applied (assuming no separation-of-powers concerns) so that the proceedings "shall conform, so far as practicable, to the laws in force at the time of such proceedings." Finally, amendments to penalty provisions—provisions pertaining to punishment, such as those creating terms of imprisonment, periods of probation or parole, fines, or forfeitures—*may* be retroactively applied if the defendant "specifically consents to the application of the new law which is 'certainly' or 'definitely' mitigating." *Lawson, supra,* 53 S.W.3d at 550; *Commonwealth v. Phon,* 17 S.W.3d 106 (Ky.2000). This is consistent with our approach to substantive, procedural, and remedial civil statutes under KRS 446.080. That statute provides in part that "[t]here shall be no difference in the construction of civil, penal and criminal statutes" and that "[n]o statute shall be construed to be retroactive, unless expressly so declared." Pursuant to these provisions, we have held, substantive civil statutes are not to be applied retroactively unless the General

Assembly expressly declares otherwise, while procedural and remedial statutes are to be so applied. *Commonwealth of Kentucky Department of Agriculture, supra; Peabody Coal Co. v. Gossett,* 819 S.W.2d 33 (Ky.1991).

█ With one exception, the new self-defense legislation effects substantive changes to our self-defense law, not changes to penalty provisions or to procedures. As noted above, the new amendments alter the circumstances constituting self-defense and create certain presumptions which will alter the burden of proof in self-defense cases. Those are amendments to the substantive law. *University of Louisville v. O'Bannon,* 770 S.W.2d 215, 217 (Ky.1989) ("Whether a particular circumstance constitutes a cause of action [or conversely a defense] ... is a matter of substantive law."); *Commonwealth of Kentucky Department of Agriculture,* 30 S.W.3d at 169 ("The change in the burden of proof was ... a change in substantive law.") Under the savings statute therefore, absent the General Assembly's contrary direction, the changes to substantive law apply prospectively only.

Rodgers asserts, nevertheless, that the 2006 amendments to Kentucky's self-defense provisions should apply retroactively in their entirety. He relies on the last sentence of the savings statute, the provision permitting retroactive application of amendments that mitigate punishments, and argues that by liberalizing the law of self-defense the new amendments tend to "mitigate" the effects of the former law. Clearly, however, this construction of the savings statute would swallow entirely the rule against retroactivity. Under Rodgers's construction, any changes to the criminal laws that either narrowed or repealed an offense or created or enlarged a defense—plainly substantive changes altering the rights and duties of citizens—

would apply retroactively because by increasing a defendant's chance of either acquittal or conviction of a lesser offense, they "mitigate" the potential penalty. In the criminal context, at least, such an approach would render KRS 446.110, the savings statute, null. That statute is not needed to prevent the retroactive application of amendments creating new or expanded offenses, because the Ex Post Facto Clause of the Constitution accomplishes that. And under Rodgers's construction the savings statute's rule against retroactivity would have no effect on amendments repealing or narrowing offenses either, leaving the statute with no effect at all. Courts, of course, are to avoid if possible constructions of statutes that read them out of existence. *King Drugs, Inc. v. Commonwealth*, 250 S.W.3d 643 (Ky.2008). Rodgers's construction of the savings statute would do just that.

Rodgers's construction, moreover, has already been rejected by our cases applying the savings statute to legislation that repeals an offense altogether, the ultimate "mitigation" in Rodgers's sense. *Commonwealth v. Louisville & N.R. Co., supra*, (prosecution could proceed for violation of repealed statute that had prohibited shipping or transporting liquor into "dry" territories except in certain limited circumstances). If one remains subject to prosecution for the pre-repeal violation of a repealed criminal statute, then one must also remain subject to the pre-amendment version of a statute amended to strengthen a defense. In short, the new substantive self-defense provisions adopted in 2006 are not mitigating penalty provisions under KRS 446.110 and do not apply retroactively to Rodgers's case.

█ Finally, with respect to the new substantive portions of the self-defense statutes, the rule of lenity does not apply. This rule, often invoked by criminal defen-

dants seeking a more favorable construction of a statute, was recently described by the United States Supreme Court as requiring "ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, —— U.S. ——, 128 S.Ct. 2020, 2025, 170 L.Ed.2d 912 (2008). Most recently, in *White v. Commonwealth*, 178 S.W.3d 470 (Ky.2005), this Court unanimously invoked the rule to construe the "intentional killing of a public official" statutory aggravator which renders a defendant eligible for the death penalty. *See also Haymon v. Commonwealth*, 657 S.W.2d 239 (Ky.1983) (applying rule in construing statute governing eligibility for probation for certain offenses involving use of a weapon); *Commonwealth v. Stinnett*, 144 S.W.3d 829 (Ky.2004) (applying rule in construing statute regarding jury determination of concurrent/consecutive service of felony sentences). As a rule of construction, the rule of lenity applies only if the statute at issue is genuinely ambiguous and even then only if the ambiguity cannot be resolved by resort to the other traditional rules of construction. *United States v. Banks*, 514 F.3d 959 (9th Cir.2008); *United States v. Gosselin World Wide Moving, N.V.*, 411 F.3d 502 (4th Cir.2005). The rule of lenity is inapplicable here because there is nothing to construe, *i.e.*, there is no ambiguous language regarding the retroactivity of the new self-defense statutes which requires construction.

**B. The Immunity Provision is Procedural and Applies Retroactively to Rodgers's Prosecution.**

The one exception to the bar against retroactive application of the new law is KRS 503.085, the new provision granting immunity to those who justifiably use self-defense:

(1) A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force, unless the person against whom the force was used is a peace officer, as defined in KRS 446.010, who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer. As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.

(2) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (1) of this section, but the agency may not arrest the person for using force unless it determines that there is probable cause that the force that was used was unlawful.

\* \* \* \* \* \*

 At least in cases such as this one, that do not involve a peace officer, the immunity provision does not constitute substantive law; it has nothing to do with who is entitled to use self-defense or under what circumstances self-defense is justified. It is, rather, purely procedural, and by prohibiting prosecution of one who has justifiably defended himself, his property or others, it in effect creates a new exception to the general rule that trial courts may not dismiss indictments prior to trial.[5] By declaring that one who is justified in using force "is immune from criminal prosecution," and by defining "criminal prosecution" to include "arresting, detaining in custody, and charging or prosecuting the defendant," the General Assembly has made unmistakably clear its intent to create a true immunity, not simply a defense to criminal charges. This aspect of the new law is meant to provide not merely a defense against liability, but protection against the burdens of prosecution and trial as well. With KRS 503.085, the General Assembly has created a new procedural bar to prosecution, and that bar, like other procedural statutes, is to be applied retroactively.

Before turning to implementation of the immunity afforded by KRS 503.085, it bears noting that the statute grants immunity to a person who "uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080". But KRS 503.055 is a wholly new substantive statute pertaining to "Use of defensive force regarding dwelling, residence, or occupied vehicle—Exceptions." and, as previously discussed, is not to be applied retroactively. Similarly, the 2006 amendments to KRS 503.050 (self-protection); 503.070 (protection of others); and 503.080 (protection of property) were substantive law changes and are not retroactive. Thus persons whose conduct occurred prior to the July 12, 2006 effective date of these amendments but whose trials were not concluded are entitled to immunity only for actions in conformity with the version of the applicable statute, (i.e. self-protection, protection of others, protection of property) in effect at the time they acted. Application of the pre–2006 self-defense statute presents no real issue here, however, because as the trial court

---

5. Other exceptions exist to the prohibition against pretrial dismissals, of course, such as where the statute allegedly violated is unconstitutional, *Commonwealth v. Bishop,* 245 S.W.3d 733 (Ky.2008), or where prosecution is barred by the Double Jeopardy Clause. *Commonwealth v. Stephenson,* 82 S.W.3d 876 (Ky.2002).

found, conflicting evidence of record precluded a pretrial finding that Rodgers was clearly acting in self-defense and thus entitled to immunity.

Specifically, the trial court ruled that even if KRS 503.085 applied to Rodgers's case, Rodgers was not entitled to dismissal because the discovery record included conflicting evidence as to whether his use of deadly force was justified. Noting that the immunity statute does not specify who bears the burden of proof or what standard of proof applies, the trial court in effect imposed on the Commonwealth a directed verdict standard, which was met, the court held, because the discovery record, in particular Eubanks's and Palmore's statements accusing Rodgers of pulling a gun and firing several times at McAfee, was sufficient to raise a jury question concerning self-defense. Rodgers contends that the trial court's use of the discovery record and directed verdict standard failed to comport with KRS 503.085. Relying on *People v. Guenther*, 740 P.2d 971 (Colo. 1987), in which the Supreme Court of Colorado was called upon to fill in the procedural gaps of that state's self-defense immunity provision, Rodgers contends that he was entitled to a pre-trial evidentiary hearing at which he would bear the burden of proving by a preponderance of the evidence that his use of deadly force was justified. We disagree.

■ The trial judge's uncertainty regarding how to implement the immunity provision is understandable because the statute offers little guidance. Indeed, the only express indication of legislative intent is in KRS 503.085(2) which provides that immunity must be granted pre-arrest by the law enforcement agency investigating the crime unless there is "probable cause that the force used was unlawful." Because the statute defines the "criminal prosecution" from which a defendant justi-

fiably acting in self-defense is immune to be "arresting, detaining in custody and charging or prosecuting," we can infer that the immunity determination is not confined to law enforcement personnel. Instead, the statute contemplates that the prosecutor and the courts may also be called upon to determine whether a particular defendant is entitled to KRS 503.085 immunity. Regardless of who is addressing the immunity claim, we infer from the statute that the controlling standard of proof remains "probable cause." Thus, in order for the prosecutor to bring charges or seek an indictment, there must be probable cause to conclude that the force used by the defendant was not fully justified under the controlling provision or provisions of KRS Chapter 503. Similarly, once the matter is before a judge, if the defendant claims immunity the court must dismiss the case unless there is probable cause to conclude that the force used was not legally justified.

■ Probable cause is a standard with which prosecutors, defense counsel and judges in the Commonwealth are very familiar although it often eludes definition. Recently, in *Commonwealth v. Jones*, 217 S.W.3d 190 (Ky.2006), this Court noted the United States Supreme Court's definition in *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983): "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." Just as judges consider the totality of the circumstances in determining whether probable cause exists to issue a search warrant, they must consider all of the circumstances then known to determine whether probable cause exists to conclude that a defendant's use of force was unlawful. If such cause does not exist, immunity

must be granted and, conversely, if it does exist, the matter must proceed.

Because immunity is designed to relieve a defendant from the burdens of litigation, it is obvious that a defendant should be able to invoke KRS 503.085(1) at the earliest stage of the proceeding. While the trial courts need not address the issue *sua sponte*, once the defendant raises the immunity bar by motion, the court must proceed expeditiously. Thus a defendant may invoke KRS 503.085 immunity and seek a determination at the preliminary hearing in district court or, alternatively, he may elect to await the outcome of the grand jury proceedings and, if indicted, present his motion to the circuit judge. A defendant may not, however, seek dismissal on immunity grounds in both courts. Once the district court finds probable cause to believe that the defendant's use of force was unlawful, the circuit court should not revisit the issue. In the case of a direct submission or where a defendant has elected to wait and invoke immunity in the circuit court, the issue should be raised promptly so that it can be addressed as a threshold motion.

The sole remaining issue is how the trial courts should proceed in determining probable cause. The burden is on the Commonwealth to establish probable cause and it may do so by directing the court's attention to the evidence of record including witness statements, investigative letters prepared by law enforcement officers, photographs and other documents of record. Although Rodgers advocates an evidentiary hearing at which the defendant may counter probable cause with proof "by a preponderance of the evidence" that the force was justified, this concept finds no support in the statute. The legislature did not delineate an evidentiary hearing and the only standard of proof against which a defendant's conduct must be measured is the aforementioned probable cause. We decline to create a hearing right that the statute does not recognize and note that there are several compelling reasons for our conclusion.

First, the pretrial evidentiary hearings that are currently conducted, such as suppression hearings, do not involve proof that is the essence of the crime charged but focus instead on issues such as protection of the defendant's right to be free from unreasonable searches and seizures, right to be represented by counsel and right to *Miranda* warnings prior to giving a statement. Similarly, a competency hearing addresses the state of the defendant's mental health and his ability to participate meaningfully in the trial. Neither of these hearings requires proof of the facts surrounding the alleged crime. An evidentiary hearing on immunity, by contrast, would involve the same witnesses and same proof to be adduced at the eventual trial, in essence a mini-trial and thus a process fraught with potential for abuse. Moreover, it would result in one of the elements of the alleged crime (no privilege to act in self-protection) being determined in a bench trial. In RCr 9.26 this Court has evinced its strong preference for jury trials on all elements of a criminal case by providing specifically that even if a defendant waives a jury trial in writing, the court and the Commonwealth must consent to a bench trial. Thus, where probable cause exists in criminal matters the longstanding practice and policy has been to submit those matters to a jury and we find no rational basis for abandoning that stance.

As for the Colorado Supreme Court's adoption of an evidentiary hearing approach, there are several fundamental differences in the Colorado statute and KRS 503.085. The Colorado statute in essence, if not in express words, provides "there shall be immunity in home invasion cases."

*People v. Guenther,* 740 P.2d at 975. The statute contains no reference to an immunity determination by law enforcement or the prosecutor, no reference to a standard of proof and no reference to how the courts should proceed to determine immunity. Writing on a blank slate and crafting a judicial procedure to be used only in home invasion cases (as opposed to all assaults and homicides wherein self-defense is raised as here in Kentucky), the Colorado court opted for an evidentiary hearing. Given the large volume of Kentucky cases for which immunity may be an issue, the probable cause standard expressly stated in KRS 503.085, and Kentucky's strong preference for jury determinations in criminal matters, we do not find the Colorado court's approach appropriate.

Finally, we note that the precise mechanism for judicial implementation of KRS 503.085 is purely academic as to Rodgers because he has been tried and convicted by a properly instructed jury in a trial with no reversible error. In short, his self-defense claim has been thoroughly examined by both the trial judge under the directed verdict standard and the jury under the court's instructions and his entitlement to self-defense has been rejected. While the trial court's approach to the immunity issue was not the one outlined by this Court, it was certainly sufficient and Rodgers suffered no discernible prejudice. Indeed if the trial court had divined the procedure outlined here, applying the probable cause standard would have produced the same conclusion, no entitlement to immunity and denial of Rodgers's motion to dismiss. Accordingly, there was no reversible error in the handling of the immunity determination.

**C. Rodgers Was Not Entitled To Additional Self–Defense Jury Instructions.**

██ Rodgers also sought jury instructions based upon the substantive 2006 self-defense amendments, but because those substantive amendments do not apply retroactively to his case the trial court correctly declined to base the instructions on them. Rodgers maintains, however, that even under the prior law he was entitled to an instruction specifying that he had no duty to retreat from McAfee's alleged assault, but was authorized "to stand his ground and meet force with force." He acknowledges that in *Hilbert v. Commonwealth,* 162 S.W.3d 921 (Ky. 2005), we rejected this very claim. There we explained that the Penal Code had incorporated prior Kentucky law concerning retreat and under that law a specific retreat instruction was not required: "An instruction on self-defense should be in the usual form, leaving the question to be determined by the jury in the light of all the facts and circumstances of the case, rather than in the light of certain particular facts." 162 S.W.3d at 926 (citing and quoting from *Bush v. Commonwealth,* 335 S.W.2d 324 (Ky.1960)). *Hilbert* expressly acknowledged the oft-cited *Gibson v. Commonwealth,* 237 Ky. 33, 34 S.W.2d 936 (1931) wherein the High Court stated: "[I]t is the tradition that a Kentuckian never runs. He does not have to." Despite what the *Hilbert* Court called "the defiant attitude toward retreat exhibited by the *Gibson* opinion," the Court found no sound basis in Kentucky law for giving a "no duty to retreat" instruction.

Rodgers contends, nevertheless, that the 2006 amendments are meant to codify prior law and to correct *Hilbert*'s mistaken reading of it. He cites no prior-law cases which the *Hilbert* Court overlooked and fails to address any of the several cases the *Hilbert* Court considered. We decline to revisit *Hilbert,* therefore, a decision not even four years old, and continue to hold that as enacted in 1975 the Penal Code

incorporated the pre-code rule that while Kentucky does not condition the right of self-defense on a duty to retreat, retreat remains a factor amidst the totality of circumstances the jury is authorized to consider and a "no duty to retreat" instruction is not required.[6] To the extent the General Assembly has altered that rule with its 2006 amendments, a question we need not address at this time, the change affects "the out-of-court ... duties of persons in their transactions with others," *Commonwealth of Kentucky Department of Agriculture*, 30 S.W.3d at 168, and so constitutes a change to the substantive law. The trial court correctly did not apply it retroactively to Rodgers's case.

 Finally, Rogers contends that the "no duty to retreat" instruction was required to preserve his constitutional right to present a defense. That right may be violated, as he notes, where there is evidence of self-defense but the trial court refuses any instruction on that defense at all. *Taylor v. Withrow*, 288 F.3d 846 (6th Cir.2002). Here, however, the trial court instructed on self-defense, and Rogers was given an opportunity to argue that theory to the jury, including the "no duty to retreat" principle. The instructions did not infringe upon his constitutional right to present a defense.

## III. The Trial Court Did Not Err In Seating Rodgers's Jury.

### A. The Court Did Not Abuse Its Discretion When It Overruled Rodgers's *Batson* Challenge.

 Rodgers next contends that he was denied equal protection when the Commonwealth used a peremptory challenge to strike one of the two African-Americans who remained in the jury pool after a third African–American was struck for cause. He maintains that Juror 117985 was impermissibly struck on the basis of her race. As he correctly notes, in *Batson, supra*, the United States Supreme Court prohibited deliberate racial discrimination during jury selection. Under *Batson*, we recently explained,

[a] three-prong inquiry aids in determining whether a prosecutor's use of peremptory strikes violated the equal protection clause. Initially, discrimination may be inferred from the totality of the relevant facts associated with a prosecutor's conduct during a defendant's trial. The second prong requires a prosecutor to offer a neutral explanation for challenging those jurors in the protected class. Finally, the trial court must assess the plausibility of the prosecutor's explanations in light of all relevant evidence and determine whether the proffered reasons are legitimate or simply pretextual for discrimination against the targeted class.

*McPherson v. Commonwealth*, 171 S.W.3d 1, 3 (Ky.2005) (citations and footnotes omitted). The trial court's ultimate decision on a *Batson* challenge "is akin to a finding of fact, which must be afforded great deference by an appellate court." *Chatman v. Commonwealth*, 241 S.W.3d 799, 804 (Ky.2007) (citation omitted). "Deference," of course, does not mean that the appellate court is powerless to provide independent review, *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (holding that the trial court's finding of non-discrimination was erroneous in light of clear and convincing evidence to the contrary), *Snyder v. Louisiana*, —— U.S. ——, 128 S.Ct. 1203, 170

---

**6.** *Hilbert*, of course, is not applicable to conduct occurring after the July 12, 2006 effective date of Senate Bill 38 but remains applicable to Rodgers and other defendants prosecuted for conduct occurring before that date.

L.Ed.2d 175 (2008) (same), but the ultimate burden of showing unlawful discrimination rests with the challenger. *Chatman, supra.*

In this case, when Rodgers raised his *Batson* challenge to the Commonwealth's allegedly suspect peremptory strike, the prosecutor recalled that during voir dire Eddings's counsel had asked the panel if anyone had ever heard of an unfair trial. Juror 117985 was the first to respond, and she stated that she knew several people who had been convicted and "done time" although they had not committed their alleged crimes. The prosecutor explained that Juror 117985's personal knowledge of such cases was apt to bias her against the Commonwealth. The trial court indicated that it would accept that explanation, at which point Rodgers's counsel objected. Counsel asserted that the Commonwealth's proffered reason for the strike was a mere pretext, as was apparent, counsel claimed, from the fact that certain non-African-American jurors had made similar responses to Eddings's voir dire question, but the Commonwealth had not struck them. The prosecutor responded that he did not recall any one else claiming personal knowledge of a wrongful conviction. The trial court could not remember any other such disclosures either, and its ruling stood.

On appeal, Rodgers reiterates his assertion that non-African-American members of the panel responded to the "unfair trial" question in much the same way as did Juror 117985 and yet were not struck. In fact, however, the record upholds the trial court. Several non-African-American panel members, including some who had seen recent news media coverage of racial disparities in the criminal justice system, did express concern that racially biased juries pose a risk to fair trials and that African–American defendants are more exposed to

that risk than are non-African-American defendants. None of those panel members, however, claimed personal knowledge of a wrongful conviction, and none indicated by his or her response that concern for racial fairness gave rise to a potential bias against the Commonwealth.

Rodgers also points to a panel member who responded to another of Eddings's voir dire questions. Counsel explained that Eddings's defense was to be a denial of any wrongdoing, and he wondered if anyone believed that the fact of Eddings's indictment and trial made that defense incredible. "Does anyone believe," he asked, "that Eddings had to have done something or he wouldn't be here?" A panel member responded that some of the people arrested and tried must be, and must have been found to be, not guilty, or the jails "would overflow." Rodgers contends that this panel member's theoretical awareness that innocent persons might be put on trial suggested the same potential for bias as Juror 117985's personal knowledge of persons who were wrongfully convicted. We disagree. A reasonable distinction is to be made between personal knowledge and mere theoretical knowledge, and it seems to us clear that the former is a much likelier source of bias than the latter. Given this distinction and in light of the deference with which we review the trial court's *Batson* rulings, the trial court did not abuse its discretion when it found that the Commonwealth's proffered race-neutral reason for striking Juror 117985 was not a pretext for discrimination.

## B. The Trial Court Properly Rejected Rodgers's "Fair Cross Section" Challenge.

Rodgers next contends that his jury was not selected from a fair cross section of the community. The fifty-per-

son venire from which Rodgers's jury was selected apparently included only three African–Americans. Eddings and Rodgers both called the trial court's attention to this fact, argued that the panel thus did not represent the community, and moved that a new panel be called. The trial court denied the motion. Rodgers contends that the trial court erred and notes that the Sixth and Fourteenth Amendments to the United States Constitution entitle him to an impartial jury drawn "from a fair cross section of the community." *Duren v. State of Missouri*, 439 U.S. 357, 359, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (*citing Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). To establish a *prima facie* violation of this right, however, Rodgers was obliged to show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364, 99 S.Ct. 664. It is not enough to allege merely that a particular jury or a particular venire failed to mirror the community, for, as the Supreme Court has explained, "[d]efendants are not entitled to a jury of any particular composition, ... but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538, 95 S.Ct. 692 (citations omitted).

Rodgers's motion did not meet this standard. Although African–Americans do indeed constitute a distinctive group for jury selection purposes, Rodgers made no attempt to show that they are regularly underrepresented on Jefferson County venires or that the jury selection process systematically excludes them. Absent these showings, the trial court did not err when it rejected Rodgers's objection to the venire.

## IV. The Trial Court Did Not Misinstruct The Jury.

### A. The Instructions Did Not Misstate the Commonwealth's Burden Of Proof.

Rodgers next asserts that the jury instructions unfairly tended to dilute the presumption of innocence and to shift the burden of proof from the Commonwealth to the defense. The instructions' introductory paragraph informed the jury that it was to find the defendant "not guilty under these instructions unless you believe from the evidence beyond reasonable doubt that he is guilty of one of the following offenses...." It then listed the various degrees of homicide. A separate instruction, Instruction No. 7, also informed the jury that Rodgers was presumed to be innocent and that the jury "sh[ould] find the defendant not guilty unless you are satisfied from the evidence alone and beyond a reasonable doubt that he is guilty." The separate instructions on each degree of homicide, however, provided that "you will find the defendant guilty of [the particular offense] under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following ..." followed by the elements of the particular offense. Rodgers contends that the formulation "not guilty ... unless" better reflects the presumption of innocence and the burden of proof than the formulation "guilty ... if and only if," and that the use of the latter in the separate offense instructions was inconsistent with RCr 9.56, which employs the "not guilty ... unless"

phrasing, and deprived him of a fair trial. We disagree.

The two formulations are logically equivalent, and whatever may be their rhetorical difference, if any, the "guilty ... if and only if" version adequately conveys to the jury the conditions the Commonwealth's proof must satisfy to authorize a guilty verdict. This is especially so, as the Commonwealth points out, in light of the introductory and "presumption of innocence" instructions which employed the "not guilty ... unless" formulation and thus underscored the two formulations' equivalence. "Instructions are proper," we have held, "if, when read together and considered as a whole, they submit the law in a form capable of being understood by the jury." *Halvorsen v. Commonwealth*, 730 S.W.2d 921, 925 (Ky.1986) (citation omitted). The "guilty ... if and only if" instructions here satisfy this standard.

## B. The Instructions Did Not Comment On Rodgers's Silence.

Finally, Rodgers contends that the instructions implicitly commented on his election not to testify and thus rendered his trial unfair. As he notes, RCr 9.54(3) provides that

> [t]he instructions shall not make any reference to a defendant's failure to testify unless so requested by the defendant, in which event the court shall give an instruction to the effect that a defendant is not compelled to testify and that the jury shall not draw any inference of guilt from the defendant's election not to testify and shall not allow it to prejudice the defendant in any way.

In compliance with this rule, when Rodgers requested a "right to remain silent" instruction, the trial court instructed the jury that "[t]he defendant is not compelled to testify and the fact that he did not testify in this case cannot be used as an inference of guilt and should not prejudice him in any way." Notwithstanding the fact that the court's instruction was taken almost verbatim from the rule, Rodgers contends that the instruction should have excluded the opening clause and that by including "is not compelled to testify," the instruction improperly implied that the prosecutor wanted Rodgers to testify, but could not force him to do so.

We reject Rodgers's claim that as given the instruction amounted to a comment on his silence. On the contrary, the instruction merely explained to the jury that the law does not compel a defendant to testify—it implied nothing about the prosecutor—and correctly directed the jury not to use Rodgers's silence against him. The jury, of course, is presumed to follow that direction, *Dixon v. Commonwealth*, 263 S.W.3d 583 (Ky.2008), and the opening clause in no way tended to undermine that presumption.

## CONCLUSION

In sum, the Commonwealth's use of Rodgers's and Eddings's post-arrest statements did not entitle Rodgers to a separate trial and did not infringe upon his right to present a defense. Rodgers's self-defense claim was correctly presented to the jury according to the law as it existed at the time of Rodgers's offense, and his claim of immunity under newly enacted KRS 503.085 was properly denied. Rodgers's jury, finally, was fairly selected and was correctly instructed with respect to Rodgers's right not to testify, his presumed innocence, and the Commonwealth's burden of proof. Accordingly, we affirm the November 22, 2006 Judgment of the Jefferson Circuit Court.

MINTON, C.J.; CUNNINGHAM, SCHRODER, and VENTERS, JJ., concur. NOBLE, J., concurs in part, concurs in

result in part, and dissents in part by separate opinion. SCOTT, J., concurs in part and dissents in part by separate opinion.

NOBLE, Justice, concurring in part, concurring in result in part, and dissenting in part:

I cannot entirely agree with either Justice Abramson or Justice Scott, but I do concur with the majority on all but two issues.

In my view, the immunity provision of KRS 503.085 is not procedural. In fact, the statute grants a new status, under certain circumstances, that did not exist before its enactment. This can only be a substantive change in the law. As such, this provision can have no retrospective application. While I otherwise agree with Justice Abramson's excellent discussion on how the immunity issue is to be determined, I do not believe it is appropriate to reach that issue in this case. However, she concludes that in fact the trial court conducted an adequate immunity hearing, and consequently the majority holding has no effect on the judgment in this case. Therefore, I concur in result.

On the other hand, the concept of "no duty to retreat" is not a substantive change in the law. Our case law has long recognized that "a Kentuckian never runs. He does not have to." *Gibson v. Commonwealth*, 237 Ky. 33, 34 S.W.2d 936 (1931). This Court, in *Hilbert v. Commonwealth*, 162 S.W.3d 921 (Ky.2005), discussed at length that "no duty to retreat" is a part of the law in Kentucky, but concluded that it was not necessary to include this language in an instruction on self defense. While clearly a part of the law, that notion had never been made a specific element of a statute until the 2006 amendments to the statutes. The majority states that whether this language must now be included in an instruction is not a question before the

Court, but does say that the added language is a *substantive* change in the law. Given the reasoning applied to the immunity provision by the majority, it naturally follows that under that view it must be included *prospectively*.

The inclusion of the "no duty to retreat" concept in the 2006 amendments does nothing more than to state what the law has always been, and thus can only be procedural, from the standpoint of whether this language should be included in the instruction. Since I believe it should always have been included, and that this Court missed a good opportunity to correct that omission in Hilbert, I would reverse to require the inclusion of "no duty to retreat" in the self-defense instruction.

SCOTT, Justice, concurring in part and dissenting in part:

Although I concur on the other issues addressed by the majority, I must respectfully dissent from the majority's conclusion that the 2006 "no duty to retreat" self-defense amendments to KRS 503.050(4), KRS 503.055(3), and KRS 503.070(3), cannot be applied retroactively, even though they are mitigating and remedial and Appellant requested their application.

I say this because the majority, relying upon *Lawson v. Commonwealth*, 53 S.W.3d 534, 550 (Ky.2001); *Commonwealth Dept. of Agriculture v. Vinson*, 30 S.W.3d 162, 168 (Ky.2000); *Peabody Coal Co. v. Gossett*, 819 S.W.2d 33 (Ky.1991); and *University of Louisville v. O'Bannon*, 770 S.W.2d 215, 217 (Ky.1989), applied the "substantive versus procedural" analysis applicable under KRS 446.080(3), rather than the "remedial" and "mitigating" analysis applicable under KRS 446.110, when the statutory amendment *mitigates "any penalty, forfeiture or punishment."*

Contrary to the majority's suggestion, *Lawson acknowledges* the applicability of KRS 446.110 to any "new law which is 'certainly' or 'definitely' mitigating," to wit:

This Court and its predecessor have consistently interpreted KRS 446.110 to require courts to sentence a defendant in accordance with the law which existed at the time of the commission of the offense unless the defendant specifically consents to the application of a new law which is "certainly" or "definitely" mitigating. [However, as Appellant] did not raise any issue in the trial court concerning the new provisions of KRS Chapter 532, he certainly did not consent to the application of the modified provisions.

*Lawson*, 53 S.W.3d at 550–51 (internal citations omitted). For reasons that the defendant in *Lawson* had not consented to the application of the newly added seventy (70) year cap on sentencing in KRS 532.110(1)(a), the court did not go on to determine whether or nor the cap was "'certainly' or 'definitely' mitigating.'" *Id.* at 550. However, the Court answered this question in the affirmative in *Cummings v. Commonwealth*, 226 S.W.3d 62, 67, 68 (Ky. 2007), as the defendant therein *had* requested its retroactive application.

*Vinson* dealt *only* with retroactive application under KRS 446.080(3), as there was no question of mitigation of any penalty, forfeiture, or punishment per KRS 446.110. *Vinson*, 30 S.W.3d at 168 ("Kentucky law prohibits the amended version of a statute from being applied retroactively to events which occurred prior to the effective date of the amendment unless the amendment expressly provides for retroactive application. KRS 446.080(3)."). It dealt with an amendment to the Kentucky Whistleblowers Act, KRS 61.103, which enlarged the substantive rights of employees, as well as the burden of proof of employ-

ers. "The amendment changed the causation and weight of evidence components as to what an employee is required to prove successfully to support a claim under the Act. The amendment also required a new burden of proof from the employer in order to successfully defend a claim under the law." *Vinson*, 30 S.W.3d at 169. Thus, as there was no question of mitigation of any "penalty, forfeiture, or punishment" under KRS 446.110, the "substantive versus procedural" analysis under KRS 446.080(3) was appropriate. *Vinson*, 30 S.W.3d at 169.

*Gossett*, also dealt with KRS 446.080(3), although the Court then strangely found the statute to be "remedial" and thus allowed the requested retroactive application of the amendment enlarging the grounds for a claimant's reopening under KRS 342.125, and thus *lessening* his burden by lowering the standard for disability. *Gossett*, 819 S.W.2d at 35–36. Thus, it was mitigating and, therefore, remedial. *Id.* at 36; *see also Miracle v. Riggs*, 918 S.W.2d 745, 747 (Ky.App.1996) ("When a statute is purely *remedial* or procedural and does not violate a vested right, but operates to *further a remedy or confirm a right*, it does not come within the legal concept of retrospective law nor the general rule [in KRS 446.080(3) ] against the retrospective operation of statutes." (emphasis added)). Admittedly, these latter opinions dealt only with KRS 446.080(3), yet they are instructive as to what this Court has considered as remedial.

*O'Bannon*, upheld the denial of retroactive application of a later enacted hospital immunity statute to an existing malpractice action. Again, however, the Court's, analysis was limited to the "substantive versus procedural" analysis applicable under the general statute, KRS 446.080(3). *O'Bannon*, 770 S.W.2d at 217

KRS 446.080(3) provides that "[n]o statute shall be construed to be retroactive, unless expressly so declared." However, under KRS 446.080(3), if a statutory change is deemed to be a procedural change, it may be allowed retroactive application. *Vinson*, 30 S.W.3d at 169.

Under our earlier common law, "the repeal of a statute repealed also the power and authority of a court to enforce a penalty incurred under the statute, and no penalty could be imposed or enforced for a violation of a statute which occurred before its repeal." *Commonwealth v. Louisville & N.R. Co.*, 186 Ky. 1, 215 S.W. 938, 939 (1919). "This rule [, however, was] modified by section 465, Kentucky Statutes," now KRS 446.110 as mentioned above. *Louisville & N.R. Co.*, 186 Ky. 1, 215 S.W. at 939

KRS 446.110 provides:

No new law shall be construed to repeal a former law as to any *offense* committed against a former law, nor as to any act done, *or penalty, forfeiture or punishment* incurred, or any right accrued or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued or claim arising before the new law takes effect, except that the proceedings thereafter had shall conform, so far as practicable, to the laws in force at the time of such proceedings. *If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect.*
(emphasis added).

Notably, KRS 446.110 and KRS 446.080(3), overlap in application when any new law mitigates any penalty, forfeiture or punishment, and the party affected consents to, or requests, the benefit of the new law. Yet, when they do, KRS 446.110 prevails over KRS 446.080(3). *Commonwealth v. Phon*, 17 S.W.3d 106, 108 (Ky. 2000) ("KRS 446.110 is more specific and should prevail over KRS 446.080(3)."). KRS 446.110 thus, "applies to states of cases in which the penalty, forfeiture or punishment is *definitely mitigated* by the provisions of the new law, and that, when it is so mitigated, the defendant can only avail himself of its provisions by consenting that judgment may be pronounced under the new law." *Coleman v. Commonwealth*, 160 Ky. 87, 169 S.W. 595, 597 (1914) (emphasis added). Plainly, the terminology "penalty, forfeiture or punishment" is rather broad and would undoubtedly include the forfeiture of one's liberty. *Cf. Phon*, 17 S.W.3d at 107.

In *Phon*, the defendant requested the right to be sentenced under the " 'new crime bill,' which added life without parole to the capital sentencing scheme." *Id.* In contrast, the Commonwealth argued "that Phon had committed the crimes in 1996 more than two years before the July 15, 1998 effective date of HB 455." *Id.* Finding that life without parole "indeed mitigates the death penalty," this court found the change to be retroactive. *Id.*

In *Bolen v. Commonwealth*, 31 S.W.3d 907 (Ky.2000), the defendant sought to take advantage of an amended version of KRS 532.080(8), which barred any violations of KRS 218A.500 from being used as convictions for determination of persistent felony offender status. We found the amendment therein definitely mitigating in that it "eliminates an eligible person's sentence from being enhanced as a persistent felony offender." *Bolen*, 31 S.W.3d at 909. And, in *Cummings*, 226 S.W.3d at 67, we noted:

[p]ursuant to KRS 446.110, the amendment including the seventy year cap

may govern his sentence even on those offenses Appellant committed prior to the effective date of that statutory provision.

*Id.* at 67 n. 3. We then found the seventy year cap applicable. *Id.* at 68.

Plainly, "[t]he policy of our law, as respects retroactive application of new laws relating to penalties, forfeitures, punishments, rights or claims, is set forth in KRS 446.110." *Kentucky State Bar Ass'n v. Taylor,* 516 S.W.2d 871, 872 (Ky.1974) (emphasis added). Moreover, it is doubtful that one would argue that the sentencing provisions considered in *Cummings* and *Phon,* or the limitation on predicates for a finding of persistent felony offender status, as considered in *Bolen,* are not examples of substantive law.

For a large part of our history, the law in Kentucky was that a person could stand his ground against an aggressor; quite simply, he was not obliged to retreat, nor consider whether he could safely do so. *Gibson v. Commonwealth,* 237 Ky. 33, 34 S.W.2d 936 (1931). *Gibson,* in fact quoted from an opinion of the noted Kentucky jurist and United States Supreme Court Justice, John M. Harlan, in *Beard v. United States,* 158 U.S. 550, 564, 15 S.Ct. 962, 39 L.Ed. 1086 (1895), to wit:

> The defendant was where he had the right to be, when the deceased advanced upon him in a threatening manner, and with a deadly weapon; and if the accused did not provoke the assault, and had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life, or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground, and meet any attack made upon him with a deadly weapon, in such way and with such force as, under all the circumstances, he, at

the moment, honestly believed, and had reasonable grounds to believe, were necessary to save his own life, or to protect himself from great bodily injury.

Thus:

> [this] doctrine of the law permeates the opinions of this court, and an instruction [to the contrary] has been condemned in several cases; the more recent one being *Caudill v. Commonwealth,* 234 Ky. 142, 27 S.W.2d 705[ ].

*Gibson,* 237 Ky. 33, 34 S.W.2d at 936. Accordingly, in Kentucky, at that time, a defendant was not required to choose a safe avenue of retreat before using deadly force to protect himself. Moreover, the enactment of the 1974 Kentucky Penal Code did not abrogate this view. *Hilbert v. Commonwealth,* 162 S.W.3d 921, 926 (Ky.2005).

In *Hilbert, citing* to Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 4–2(d)(2) (1998), we noted "[a] proposal by the drafters of the Kentucky Penal Code to change this rule was rejected by the General Assembly and the right of a defender to stand his ground against aggression was left intact." Hilbert, 162 S.W.3d at 926. Notably, "it is [a] tradition that a Kentuckian never runs. He does not have to." *Id. (citing Gibson,* 237 Ky. 33, 34 S.W.2d at 936).

However, "[d]espite the defiant attitude towards retreat exhibited by the *Gibson* opinion, Kentucky decisions [over the intervening years] have generally not adhered to such an absolute interpretation of the 'no duty to retreat rule,' nor did our [more recent] predecessor court[s] require jury instructions describing the same." *Hilbert,* 162 S.W.3d at 926; *see also* James M. Roberson, *New Kentucky Criminal Law and Procedure* § 313 (2d ed.1927) (stating that "the rule now is that whether the assailant should stand his ground or give back is the question for the jury, and

that he may properly follow that course which is apparently necessary to save himself from death or great bodily harm."). Thus, Kentucky, in more recent years, has followed "the principle 'that when the trial court adequately instructs on self-defense, it need not also give a no duty to retreat instruction.'" *Hilbert,* 162 S.W.3d at 926 (internal citations omitted).

However, as previously noted, effective July 12, 2006, and following the occurrence of the crimes charged herein—*but before their trial*—the Legislature amended Kentucky's criminal statutes in multiple places to re-insert this longstanding component of self-defense. SB 38, 2006 Kentucky Laws Ch. 192. KRS 503.055(1) as amended, established a presumption, with some exceptions, that a person *has* "a reasonable fear of imminent peril of death or great bodily harm" to himself or others when using defensive force against someone unlawfully entering or present in a dwelling, residence or vehicle, or the other person is removing or trying to remove someone therefore against their will. The legislation also codified the pre-existing "no duty to retreat":

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has *no duty to retreat* and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

KRS 503.055(3) (emphasis added). KRS 503.050 was also amended to state "[a] person does not have a duty to retreat prior to the use of deadly physical force." KRS 503.050(4). Likewise, KRS 503.070 was amended to address the justification of protecting another and now recognizes that a person "does not have a duty to retreat if the person is in a place where he or she has a right to be." KRS 503.070(3).

Here, the 2006 amendments on the "no duty to retreat" doctrine did not create any new duty or obligation on behalf of the defendant, nor impair any vested right, but only operated in confirmation of his preexisting right. *See Hilbert,* 162 S.W.3d at 926; *see also Riggs,* 918 S.W.2d at 747 ("When a statute is purely remedial ... and does not violate a vested right, but operates to further a remedy *or confirm a right,* it does not come within ... the general rule against the retrospective operation of statutes." (emphasis added).). Thus, its application was retroactive if there was sufficient evidence to support the instruction.

"A defendant is entitled to have the jury instructed on the merits of any lawful defense which he or she has." *Grimes v. McAnulty,* 957 S.W.2d 223, 226 (Ky.1997). This "entitlement ... is dependant upon the introduction of some evidence justifying a reasonable inference of the existence of [the] defense." *Id.*

Looking at the evidence in a light most favorable to Appellant, the introduction of parts of his confession established that he was standing in the yard and was attacked by McAfee who had a gun. As they were wrestling, Appellant told McAfee, "man, get off of me, man; just get off of me, man. I don't won't no problems. I'm trying to leave, man, get off of me." He then "heard one shot, and [said] I didn't know where it came to[.] I was protecting myself. I didn't know if I was hit." "We was wrestling, and [he] had me. Somehow I managed to grab the gun out of his hand, and, I just remember, I yanked it back, like that." "And I shot at his leg."

Since Appellant asked for the instruction under the amendments discussed, and the

evidence in this case necessarily included an issue of self-defense and thus, an issue as to a "duty to retreat," it was error not to instruct the jury fully on the relevant law regarding the duty.

As I could not find the error to be harmless under the facts of this case, I would vacate the conviction and remand for a new trial with appropriate instructions including the "no duty to retreat."