# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: APRIL 21, 2011
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2008-SC-000798-MR

PATRICK ALLEN WATKINS                                         APPELLANT

V.            ON APPEAL FROM CLARK CIRCUIT COURT
             HONORABLE GARY D. PAYNE, JUDGE
                   NO. 07-CR-00051-001

COMMONWEALTH OF KENTUCKY                          APPELLEE

**AND**

2008-SC-000823-MR

JOY RENEE WATKINS                                            APPELLANT

V.            ON APPEAL FROM CLARK CIRCUIT COURT
             HONORABLE GARY D. PAYNE, JUDGE
                   NO. 07-CR-00051-002

COMMONWEALTH OF KENTUCKY                          APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING, IN PART, AND REVERSING AND REMANDING, IN PART</u>**

Appellants, Patrick and Joy Watkins, were found guilty by a Clark Circuit Court jury of wanton murder. For these crimes, Appellants were sentenced to life imprisonment. They now appeal their convictions as a matter of right. Ky. Const. § 110(2)(b).

# I. BACKGROUND

In the spring of 2007, Patrick and Joy Watkins resided in Winchester, Kentucky. The couple was married and had two young children together. The Watkinses had also obtained legal custody of young Michaela Watkins, Patrick's daughter from a previous marriage. Michaela was twelve years old and had been in foster care after being removed from her biological mother's custody due to severe abuse and neglect. Michaela later died a tragic death. The relevant facts are as follows.

At 3:56 p.m. on Sunday, March 11, 2007, Patrick called his sister, Stephanie Radar, and asked her to come to his apartment. When Stephanie and her husband arrived, Patrick indicated that something was wrong with Michaela. After Stephanie asked Patrick where Michaela was, he initially responded, "[s]he's in there on the bed asleep." Patrick soon admitted that Michaela was not asleep but dead, explaining that she had fallen down the stairs some forty-five minutes earlier. Stephanie did not believe him because "[i]t looked like she had been beaten to death." Patrick stated that he "needed his family" and that "he was going to jail."

In response to Radar's 911 call, paramedic Gary Conn soon arrived on the scene and found Michaela lying on her bed with a blanket draped over her body. As Conn was examining Michaela, Patrick appeared at the door and Conn asked him what had happened. Patrick again responded that Michaela had fallen down the stairs an hour earlier. Conn, however, did not believe that

her injuries were caused by such a fall, nor did he believe that Michaela had only been dead for an hour. He noted that she was cold to the touch, rigor mortis had set in, and lividity was present. When Sergeant Frick asked what happened, Patrick similarly responded that Michaela had fallen down the stairs and that, afterward, she went to her bedroom. Sergeant Frick discovered Michaela with "a bruised face like I have never seen before."

Detective Hall began his investigation at the scene and Patrick gave the same explanation. He viewed Michaela's body and observed pattern bruising on her face, a bite mark behind her ear, a bite mark on her left ankle, and significant burns on her legs. He noticed that the burn marks went straight down the back of her legs, indicating that she had likely been held down in hot water, that her heels had unbroken blisters, indicating that she likely did not walk afterwards, and that there were no splash marks on her body, indicating that the burns were not accidental. Patrick and Joy stated that Michaela had burnt herself the previous night while taking a bath.

Based upon all the evidence, deputy coroner Dr. Hamon believed that Michaela died between four and six hours earlier (between 11:15 a.m. and 1:15 p.m.), that she did not die in bed but was placed there, and that her injuries were not self-inflicted.

The testimony of medical examiner Cristin Rolf figured prominently into trial. Dr. Rolf identified dozens of bruises and abrasions to Michaela's head, as well as a broken vertebrate and bleeding around her spinal cord. Michaela

3

suffered at least second-degree burns on the backs of her legs, buttocks, vagina, and feet, and the skin was removed in spots. There was a well-defined line where the tissue was burned, while the balls of her feet and toes were not burned. Dr. Rolf believed that someone either held Michaela in hot water or that she was too weak to move.

Notably, Dr. Rolf discovered that Michaela had a large bruise on the left side of her chest. Under the bruise, her ribs were fractured (five in particular were crushed and compressed into other bones), and the left lung was partially collapsed – known as a "flailed" chest injury, causing significant pain and difficulty breathing. Though Dr. Rolf was unable to determine the exact cause of the chest injury, she believed that it was likely brought about by a forceful, high velocity blow or blunt impact.

Dr. Rolf concluded that all of Michaela's injuries occurred within thirty-six hours and that they were neither self-inflicted nor caused from a fall down the stairs. She believed that the flailed chest was the cause of Michaela's death, though noting that the blunt impacts to her head, trunk, and extremities could have also contributed. Dr. Rolf also noted that Michaela had burns covering her lower extremities and testified that "with the removal of the skin, a person can become infected and die easily—very quickly—if it's not treated."

4

Joy gave several taped police statements.[1] Though initially reluctant to offer much detail, Joy admitted that, on Saturday morning, she placed her entire body weight on the child, restraining her, and hitting her in the face.[2] At that point, Michaela urinated on herself, which temporarily stopped the abuse. Both Joy and Patrick then ordered Michaela to bathe. Joy maintained that she did not know who ran the hot water causing Michaela's burns, but that she ran upstairs to the bathroom after hearing Michaela scream and saw Patrick standing in the hallway. Michaela proceeded to fall three times and strike her head (twice in the bathroom and once down the stairs). Michaela's legs were later bandaged and ointment was applied to her burns. Joy noticed that the skin was peeling on Michaela's heels and she asked Patrick whether they should take Michaela to the hospital, but he responded that she would be okay. Patrick carried Michaela downstairs where she ate dinner and watched television.

According to Joy, Michaela awoke the next morning and ate breakfast but was acting strangely. She stated that Michaela vomited and began to fall down and lurch over at times. The family soon left the apartment and drove to Red River Gorge for a family picnic.

Joy maintained that Michaela was alive during the drive to the Gorge. Contradicting prior statements, Joy stated that, once there, Michaela was not feeling well and that she stayed in the car while the other children ate and

---

[1]  Patrick and Joy gave taped statements to police, all of which were played for the jury. Neither testified at trial.

[2]  Joy admitted to occasionally biting and backhanding Michaela "really hard."

5

played. Several times throughout the day, Joy stated that Michaela was in need of medical attention. She claimed that Patrick refused to take Michaela to a hospital because he suspected that Michaela was trying to manipulate them and because he was fearful that Joy's prior acts of physical abuse would be discovered.

On the drive back to Winchester, Michaela was unresponsive and Joy was upset. When they arrived home sometime before 3:00 p.m., Patrick carried Michaela to her bedroom before returning to Joy and stating that something was wrong.

Patrick offered less information to police and his account diverged from Joy's in several ways. According to Patrick, it was Michaela that had filled the tub with scalding hot water and burned herself. Patrick maintained that Michaela was later able to walk down the stairs and eat dinner with the family. On the way home from the Gorge, he noticed that Michaela's hands were cold. When the family returned home, Patrick claimed that Michaela walked into the apartment. It was then that Michaela allegedly fell down an entire flight of stairs and hit her head before going to bed. When Patrick went to check on her thirty to forty-five minutes later, he found Michaela lying in her bed unresponsive and not breathing. Patrick admitted that a "mistake" was made in failing to take Michaela to the hospital. When confronted with Joy's statement that she found him upstairs after hearing Michaela scream, Patrick announced he had nothing else to say.

6

At trial, Appellants argued that their culpability, if any, did not rise to the level of wanton murder. Patrick maintained that Michaela had burned herself, that he had never witnessed Joy physically abuse Michaela, but that he neglected to take her to a hospital or otherwise obtain medical assistance. While Joy admitted that she, too, should have sought medical assistance for Michaela, she claimed that she did not intentionally or knowingly cause Michaela's fatal chest injury, and that she did not know who had run the hot bath water.

At the conclusion of trial, the jury found Appellants guilty of wanton murder, fixing their punishment at life imprisonment. On appeal, Appellants raise several allegations of error in their underlying trial. Due to the improper hearsay used against him, we reverse Patrick Watkins' conviction, but affirm Joy Watkins'.

## II. ANALYSIS

### A. Right of Confrontation: Statements

Appellants argue that their Sixth Amendment confrontation rights were offended when the trial court permitted the Commonwealth to introduce their police interviews without redaction, limiting admonition, or opportunity for cross-examination. Puzzlingly, the Commonwealth contends that the "statements *exculpated* both of the Watkines, rather than incriminating either of them."

Prior to trial, Appellants filed a motion arguing that, absent an opportunity for her cross-examination, the Confrontation Clause prohibited their unredacted, out-of-court statements to be admitted at trial. The motion was continued several times and, ultimately, never heard or ruled upon until the Commonwealth attempted to play the police interviews for the jury. In response to a defense objection, the Commonwealth insisted that during the interviews, Appellants simply did not incriminate one another and thus redaction was not required. The trial court briefly reviewed, *in camera,* the partial transcripts tendered before overruling the objection. Having reviewed the statements, we find error with respect to both Patrick and Joy; but, pertaining to Joy, we hold the error was harmless.

At the outset, we note that though Patrick's brief cites *Crawford v. Washington,* 541 U.S. 36 (2004) in support of his contentions here, the nature of his argument indicates that his allegation of error rests not on *Crawford,* but, rather, on *Bruton v. United States,* 391 U.S. 123 (1968) – i.e., that Joy's unredacted statements incriminated him.[3]

*Crawford* held that "the Confrontation Clause of the Sixth Amendment forbids admission of all testimonial *hearsay* statements against a defendant at a criminal trial, *unless* the witness is unavailable *and* the defendant has had a

---

[3] In his original motion in limine before the trial court, Patrick cited *Bruton* and the Commonwealth, noting this "curiosity" responded in its brief to both *Crawford* and *Bruton.*

prior opportunity for cross-examination."[4] *Bray v. Commonwealth,* 177 S.W.3d 741, 743 (Ky. 2005) (emphasis added) (*citing Crawford,* 541 U.S. at 68); *see also Rankins v. Commonwealth,* 237 S.W.3d 128, 130 (Ky. 2007) ("Returning to the Framers' intent, *Crawford* held that the Sixth Amendment prohibits the admission of the testimonial statement of a declarant who does not appear at trial, unless the declarant is unavailable to testify *and* the defendant had a prior opportunity for cross-examination."). "In the context of a joint trial, therefore, 'the pretrial confession of one [defendant] cannot be admitted against the other unless the confessing defendant takes the stand.'" *Rodgers v. Commonwealth,* 285 S.W.3d 740, 745-46 (Ky. 2009) (*quoting Richardson v. Marsh,* 481 U.S. 200, 206 (1987)).

Before *Crawford* may apply at all, the hearsay at issue must be considered "testimonial" in nature. As we explained in *Rankins,* the holding in *Crawford* concerns "'testimonial' statements, because it is statements of a testimonial character, as opposed to other hearsay, which cause the declarant to be a witness against the accused for purposes of the Confrontation Clause." 237 S.W.3d at 130 (citation omitted). At a minimum, testimonial hearsay encompasses "prior testimony at a preliminary hearing, before a grand jury, or at a former trial" or statements made during "police interrogations." *Crawford,* 541 U.S. at 68. In general, hearsay may be "testimonial when the

---

[4] The Court in *Crawford* explicitly noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted" – i.e., non-hearsay uses. 541 U.S. at 59 n.9 (*citing Tennessee v. Street,* 471 U.S. 409, 414 (1985)).

9

circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).[5]

However, "*Crawford* and its progeny *do not* address the use of a prior testimonial statement *against the declarant himself*," which is the question addressed in *Bruton* and its progeny.[6] *Rodgers*, 285 S.W.3d 746. Therefore complementing the protections in *Crawford* is the holding in *Bruton*, wherein the Supreme Court of the United States "held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's

---

[5] The Court in *Crawford* added:

> Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2531 (2009) (*quoting Crawford*, 541 U.S. at 51-52).

[6] Generally speaking, a statement is

> "against" a defendant for purposes of the Confrontation Clause *only if* [the] testimony is part of the body of evidence that the jury may consider in assessing his guilt. Therefore, a witness whose testimony is introduced in a joint trial with the limiting instruction that it be used only to assess the guilt of one of the defendants *will not* be considered to be a witness "against" the other defendants [unless it is incriminating pursuant to *Bruton*].

*Cruz v. New York*, 481 U.S. 186, 190 (1987) (emphasis added).

confession [implicating] him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 202 (1987) (summarizing the *Bruton* rule); *see Bruton*, 391 U.S. at 137 ("[I]n the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.").

Yet, given certain conditions, a joint trial may be had: "[i]f . . . the [non-testifying co-defendant's] confession is redacted so as to remove all reference to the co-defendant(s), including obvious inferential references, then the confession may be admitted against the confessor," *Rodgers*, 285 S.W.3d at 746 (*citing Richardson*, 481 U.S. at 206; *Gray v. Maryland*, 523 U.S. 185 (1998)), "*if* a limiting instruction is given to admonish the jury not to consider the [confession] as evidence against any defendant other than the [confessor]."[7] *Commonwealth v. Stone*, 291 S.W.3d 696, 700 (Ky. 2009) (*citing Richardson*, 481 U.S. at 207-08); *but see Shepherd v. Commonwealth*, 251 S.W.3d 309, 314 (Ky. 2008) ("In accordance with *Gray v. Maryland*, 523 U.S. 185, 195 . . . (1998) and *Stanford v. Parker*, 266 F.3d 442, 457 (6th Cir. 2001), this Court has extended slightly the protections of *Bruton*, holding that redacted confessions which merely delete the name of the other defendant or insert the phrase 'other party' or 'deleted' also constitute a *Bruton* violation because the

---

[7] We restate that the court need only "give the limiting admonition 'upon request.'" *Barth v. Commonwealth*, 80 S.W.3d 390, 397 (Ky. 2001); *see also Caudill v. Commonwealth*, 120 S.W.3d 635, 658 (2003).

statements still facially incriminate the co-defendant.") (*citing Barth*, 80 S.W.3d at 395 (Ky. 2001)); *Stone*, 291 S.W.3d at 701 ("When the purpose of the statement is to incriminate the non-declarant, a *Bruton* redaction makes no sense. In that situation, *Crawford* must be considered.").[8]

### 1. Patrick's *Bruton* Challenge to Joy's Statements

Turning to Patrick's arguments here, he identifies seventeen different statements that Joy made in police interviews that, he contends, incriminated him.

We have reviewed the statements and conclude that the following were properly admitted without redaction. When asked whether Joy saw Patrick hit Michaela, Joy replied, "[i]f he did, then I don't know why, and I didn't see it and that's the honest to God's truth. I'm just saying I did not see it . . . Is it possible that he did? I'm not saying it's not possible." At another point in the interview, Joy was again asked to explain what happened during Michaela's bath: "Now as far as Michaela goes, am I saying my husband didn't hold her in the bath? I'm not saying he did. I'm not saying he didn't. . . . It is possible

---

[8] In *Rodgers*, we also noted:

> Where a jury hears a non-testifying co-defendant's statement to be considered only against that particular defendant/declarant, both the redaction and the limiting instruction . . . insure compliance with *Crawford*, i.e., facially incriminating matters are removed and even if inferentially incriminating statements remain the admonition is presumed to be followed so that the testimonial hearsay is not being used against the defendant(s) who did not make the statement. [Therefore, t]he combination of redaction and limiting instruction satisfies *Crawford*.

285 S.W.3d at 747; *but see Stone*, 291 S.W.3d at 697-701 (*Crawford* implicated when redacted confession of co-defendant explicitly used against defendant).

that he did, I'm not saying it's not possible." Joy also made several statements regarding the family's trip to Red River Gorge and other events occurring on the day Michaela died, including, "Was she unresponsive in the car on the way back from the Gorge? Yes, she was." And, "[i]t felt to me like she had a heartbeat, but I wasn't sure." In response the question asking whether Joy knew Michaela was dead, Joy stated "I didn't know for sure, like I told you earlier, I was not positive, I was driving . . . I suspected something was not right . . . something was very serious [sic] wrong." Finally, when the group arrived home from the Gorge, Joy stated that she, "came in and got the little ones some juice and they went upstairs to play."

In none of these statements can it be said that Joy expressly or implicitly incriminated Patrick in Michaela's death.

However, we conclude that the following statements were improperly admitted and should have been redacted in order to protect Patrick's right of confrontation under *Bruton*. In her statements, Joy indicated that Patrick was upstairs with Michaela alone when she was burned in the bath tub:

> Yeah, [Patrick] was upstairs at some point in time. I do know that. I don't know what for.

> When I went upstairs, I tried to help get her out of the bathtub and she flopped backwards before anybody could grab her. I asked [Patrick] what happened and he said, "I guess the water's too hot." Does he feel responsible? Yeah, I think he does feel responsible. I'm not going to lie to you.

Though not specifically identified, Joy's related statement to the effect that she found Patrick in the upstairs hallway after hearing Michaela scream should

13

have also been redacted. In addition, Joy assigned knowledge to Patrick that Michaela was grievously injured and in need of medical attention and explained that Patrick, in response, did nothing:

> I told my husband that I thought she needed to go to the hospital. I did.
>
> That's when I told him that we needed to get something to put on her feet. So he gave me the money and I went down and got that and I came back and then I told him later on that we probably need to take her to the hospital. He said "No. She'll be fine."
>
> She said, "Can I lay down?" and I said, "Yeah, you can lay down." So she laid down for a minute and when she laid down and stretched out, I noticed the skin on her heels peeling. And that's when I told her dad, I said, "Maybe we should take her to the hospital." And the reason he didn't want to take her to the hospital wasn't to protect himself. I think it was to protect me because of the bruises on her face.
>
> Later on that night, I told my husband, I said, "Are you sure?" She hadn't complained of hurting and I said, "Are you sure we shouldn't take her to the hospital?" And he said, "I think she's fine. She's just trying to use it as a way to manipulate us." I said, "Okay."
>
> When I went in that morning is when I stressed how important it was that I thought we needed to take her to the doctor because that's when I realized how bad her skin was peeling. I don't even recall what my husband said at the time. I just know that we just didn't go to the doctor.
>
> All we kept saying back and forth to each other [sic], "Is she okay? What should we do? Where should we go? What should—" that's all we kept saying.
>
> I think we just went home and said, "let's see if she's all right," and once we got home and about an hour in, we realized that . . . after he got her in and we got her to the bedroom and she was in there I don't know how long and she hadn't moved and that's when we really realized, no, she's gone.
>
> At that point, yeah, I knew something was definitely, he told me

14

that he went in to check on her and he said she wasn't—something wasn't right. He just said, "She's not right. I don't think she's breathing."

All the way back to Winchester, we both just [sic] there and we kept . . . "Is she alive?" I mean we were literally in shock.

Furthermore, when asked why she did not seek medical treatment for Michaela, Joy responded:

I guess because Patrick was so panicky and scared. He was worried about our kids and worried about them being taken away. That's where I made my mistake and I told you that earlier.

And subsequently, when asked why someone did not call for an ambulance after Patrick stated that he did not think Michaela was breathing, Joy stated, "I don't know. I just did what—I was just doing what I was told to do."

That these statements were especially incriminating cannot be questioned when one of the three theories of wanton murder expressed in the jury instructions was that Patrick "fail[ed] to provide medical treatment or aid for [Michaela's] resulting injuries." These statements directly inculpated Patrick, thus we cannot conclude that they were cumulative evidence or harmless error. Rather, this is a blatant situation "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." *Bruton*, 391 U.S. at 135-136. Because the Commonwealth disregarded a basic tenet of constitutional law—the *Bruton* rule—by forging ahead and introducing Joy's unredacted and inculpatory statements, we have no choice but to reverse.

Since we are reversing Patrick's conviction, we address, at the conclusion of this opinion, his remaining allegations of error only to the extent that they are likely to recur on retrial.

## 2. Joy's *Bruton* and *Crawford* Challenge to Patrick's and Other Witness' Statements

Joy, too, argues that her Sixth Amendment confrontation rights were offended when the Commonwealth was permitted to introduce Patrick's police interview without redaction, limiting admonition, or opportunity for cross-examination. Having reviewed Patrick's statements that were played for the jury, we agree, but find that the error harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *Heard v. Commonwealth*, 217 S.W.3d 240, 244 (Ky. 2007) ("It must not be overlooked that 'before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt.'") (quotation omitted).

Save one reference, Joy's wholesale objection to Patrick's interview as offending *Bruton* lacks merit. Patrick stated: "Obviously there was a mistake made because *we* didn't take [Michaela] to the doctor, for one. That was a mistake, for one. That was made." (Emphasis added). Joy, however, fails to show how this reference prejudiced her when she admitted that she knew something was wrong and that she should have taken Michaela to a hospital for medical treatment.

16

Joy contends that Patrick's statements nevertheless constituted testimonial hearsay in violation of *Crawford*. While Patrick's statements were most assuredly testimonial in character, Joy offers no credible argument for how his statements prejudiced her but merely asserts that Patrick's denials and explanations were so implausible in the face of contrary forensic evidence that she, too, was somehow tainted.

Next, Joy takes issue with statements that Patrick made to Conn, Hall, Frick, and Stephanie Radar. At the scene, Patrick proffered the same explanation to Conn, Sergeant Frick, and Detective Hall regarding Michaela's cause of death: that she had fallen down the stairs some thirty to forty-five minutes prior to their arrival. In the 911 call placed by Radar, Patrick can be heard in the background stating that Michaela had burnt herself, fallen out of the bathtub and again down the stairs, along with a similar chronology of the days' events he would later give during his police interview. Joy argues that these statements, which were met with skepticism, somehow prejudiced her. While none of these statements facially incriminated her, Joy again asserts that their admission violated *Crawford*.

We find no manifest injustice.[9] Even assuming that there was no ongoing emergency and Patrick's statements were testimonial hearsay, Joy

---

[9] Introduction of the statements was not objected to at trial and thus the errors are not preserved. Joy, however, requests palpable error review. This Court has held that "an unpreserved error may be noticed on appeal only if the error is 'palpable' and 'affects the substantial rights of a party,' and even then relief is appropriate only 'upon a determination that manifest injustice has resulted from the error.'" *Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009) (*quoting* RCr 10.16). "An unpreserved error that is both palpable and prejudicial still does not justify relief

provides no compelling reason as to why such error should not be recognized as harmless beyond a reasonable doubt, which it is.

## B. <u>Right of Confrontation: Lab Reports</u>

Joy next contends that it was a violation of *Crawford*, and more specifically, its most recent incarnation, *Melendez-Diaz*, for the Commonwealth to admit various lab reports when their authors did not testify at trial so as to permit cross-examination. *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009). We agree, but also find such error to be harmless.

At trial, Dr. Rolf, the assistant medical examiner, testified that she utilized two other experts, a dentist and a neuropathologist, in formulating her autopsy report. Near the conclusion of Dr. Rolf's direct examination, the Commonwealth moved to introduce her autopsy report as well as the dentist's report and neuropathologist's report. Joy objected and argued that the Confrontation Clause forbids these additional reports from being received into evidence because the individuals who prepared them were not available for cross-examination. In response, the Commonwealth argued that Dr. Rolf was present when the dentist and neuropathologist performed their examinations and that her autopsy report thus incorporated those reports. The trial court overruled the objection, finding that Dr. Rolf had appropriately relied upon the reports.

---

unless the reviewing court further determines that it has resulted in a manifest injustice, unless, in other words, the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Id.* (*quoting Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006)).

As detailed above, the Sixth Amendment provides a criminal defendant with the "right . . . to be confronted with the witnesses against him," and when the prosecution seeks to introduce testimonial hearsay, the right to cross-examination. The Supreme Court of the United States recently considered the applicability of the Confrontation Clause to "affidavits reporting the results of forensic analysis." *Melendez-Diaz*, 129 at 2530. In that case, Melendez-Diaz was charged with distributing cocaine, and, at his trial, the prosecution introduced three "certificates of analysis," prepared by state-employed analysts, concluding that the substance he possessed was cocaine. *Id.* at 2530-31. The Court held that the admission of these certificates violated the Confrontation Clause, as Melendez-Diaz was unable to confront the analysts who prepared these certificates, i.e., the witnesses against him. *Id.* at 2532. The High Court further explained that "the 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination:'" declaring that the substance found in Melendez-Diaz's possession was cocaine. *Id.* at 2532 (*quoting Davis v. Washington*, 547 U.S. 813, 830, (2006)). Finally, the Court held that the prosecution failed to satisfy *Crawford's* dictates, since it could not "sho[w] that the analysts were unavailable to testify at trial and that [Melendez-Diaz] had a prior opportunity to cross-examine them." *Id.* at 2532.

With the above framework in mind, we conclude here that the trial court erred when it admitted the dentist's and neuropathologist's reports. Neither

medical professional testified at trial, thereby depriving Joy of her constitutional right "to be confronted with the witnesses against [her]." Rather, like *Melendez-Diaz*, she was forced to accept, without question, the substance and accuracy of the dentist's and neuropathologist's reports. Furthermore, the Commonwealth failed to show that the dentist and neuropathologist were unavailable to testify and that Joy had a prior opportunity to cross-examine them.

However, as previously stated, although we find error here, such error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *Heard v. Commonwealth*, 217 S.W.3d 240, 244 (Ky. 2007) (detailing the harmless error standard for examining constitutional errors). The dentist's report, which performed a bite mark analysis, was introduced apparently as evidence that Joy bit Michaela. We conclude this report is harmless given Joy's admission that she did bite the victim. Next, the neuropathologist's report is also harmless, as it was extraneous to Commonwealth's theories—beating, scalding, or failing to medically treat— regarding the method of wanton murder.[10] Notably, Joy fails to present *any* argument addressing the alleged prejudicial effect, apparently content to call it

---

[10] Joy makes several passing, detached statements regarding the admission of the toxicology tests on the victim's blood and urine. Those tests revealed the presence of an antidepressant, a mood-controlling drug, and Tylenol. It is unclear whether she specifically objected and preserved this error. Nonetheless, for the same reasons as above, namely, that the evidence is not related to the Commonwealth's theories of wanton murder, any error is harmless beyond a reasonable doubt.

to our attention. Therefore, after examining the evidence, we conclude that there is no reasonable possibility that this error contributed to her conviction.

## C. Jury Instructions

### 1. Unanimous Verdict

Joy next contends that, pursuant to Section 7 of the Kentucky Constitution, she was denied the right to a unanimous verdict because the jury instructions, as presented, permitted her murder conviction on theories unsupported by the evidence. The wanton murder[11] instruction under which she convicted read:

> You will find [Joy] guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about the 11th day of March, 2007, and before the finding of the Indictment herein, [Joy] caused the death of Michaela Watkins by wantonly engaging in a course of conduct *by beating or scalding her, or failing to seek medical treatment or aid for the resulting injuries,* which created a grave risk of death to Michaela Watkins and thereby caused the death of Michaela Watkins under circumstances manifesting an extreme indifference to human life.

(Emphasis added). The above instruction, known as a combination instruction, presented multiple theories of the crime in a single instruction. As such, Joy contends that the verdict did not specify under which of the three theories they were found guilty, and thus, argue that this instruction offended

---

[11] "A person is guilty of murder when . . . he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020(1)(b). *See also* KRS 507.020 Commentary (1974) ("Subsection (1)(b) following the lead of the Model Penal Code and other modern statutes, manifests a judgment that there is a type of homicide that should be treated as murder even though the actor had no conscious desire to cause the victim's death.").

their right to a unanimous verdict because there was insufficient evidence to support all three alternative methods of committing wanton murder.

Before turning to the merits of the argument, we pause briefly to note that Joy failed to preserve this alleged error and essentially concedes such in her brief. The error assigned to an erroneous jury instruction is unpreserved "unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection." RCr 9.54(2). Joy concedes that "no specific objection was made to the non-unanimous verdict," and does not argue, or provide any citation to the record, that she offered an instruction or made a motion relating to this jury instruction. Thus, we review this assignment of error to jury instruction for palpable error. RCr 10.26.

This Court has long held that "a verdict can not be successfully attacked upon the ground that the jurors could have believed either of two theories of the case where both interpretations are supported by the evidence and the proof of either beyond a reasonable doubt constitutes the same offense." *Wells v. Commonwealth*, 561 S.W.2d 85, 88 (Ky. 1978). Thus, a single jury instruction may combine multiple theories "so long as there is sufficient evidence of each [theory]." *Travis v. Commonwealth*, 327 S.W.3d 456, 459-460 (Ky. 2010).

22

We now examine the sufficiency of the evidence supporting each of the three theories contained in the wanton murder jury instruction *sub judice*.

### a. "Beating"

The evidence supported the theory that Joy may have committed wanton murder by causing Michaela's fatal chest injury or contributing to her death by beating her. Dr. Rolf testified that Michaela's chest injury was caused by a blunt, firm, and crushing force as Michaela's back remained supported against a hard surface. She also testified that the various blunt impact injuries to Michaela's head, trunk, and extremities could have contributed to her death. In Joy's final police interview, she admitted that, on the morning of the day Michaela died, she and Michaela "got into a tussle" on the floor during which Joy placed her entire body weight upon Michaela to in order to restrain her as Joy punched her head. Joy admitted that she inflicted the bruising and stated that it was not Patrick's fault.

### b. "Scalding"

The evidence supported the theory that Joy may have committed wanton murder by burning Michaela.[12] As stated above, Dr. Rolf's testified that her examination revealed burns covering a "large amount of the [victim's] body surface area;" and furthermore; Dr. Rolf stated that "with the removal of the skin, a person someone can become infected and die easily—very quickly."

---

[12] As stated above, Dr. Rolf testified that "with the removal of the skin a person can become infected and die easily—very quickly—if it's not treated."

23

Joy admitted ordering Michaela to bathe and being present upstairs with her at times during her bath. Taken with the fact that substantial forensic evidence showed that Michaela's burns were not self-inflicted but were the product of being *held* in three to four inches of nearly boiling hot water, the evidence was sufficient to give rise to a reasonable inference that Joy was not being entirely truthful and may have burned Michaela.

### c. "Failing to Seek Medical Treatment or Aid"

The evidence supported the theory that Joy may have committed wanton murder by failing to seek medical treatment or aid for injuries *she inflicted*. A review of Appellants' police statements reveals that Joy explicitly admitted that she had individually failed to take Michaela to a doctor or hospital, knowing that she was seriously ill or injured. Dr. Rolf concluded that all of Michaela's injuries could have been treated had she been given proper medical support. Therefore, we hold that there was sufficient evidence to support this theory of wanton murder.

In an incomplete sub-argument, Joy claims that the trial court erred in failing to instruct the jury on whether she had a duty to seek medical treatment. She contends that legal duty is an element in failing to provide medical care, and attempts to draw a parallel to a deadly weapon jury instruction.[13] According to Joy, it is error for a court not to instruct the jury that it must first find a gun operable before concluding that it was a deadly

---

[13] *Thacker v. Commonwealth*, 194 S.W.3d 287 (Ky. 2006). This is the only case Joy cites in support of her argument.

24

weapon, just as it was error for the court here to fail to instruct on her duty to provide medical care. We disagree and find Joy's analogy inapt.

This section of the jury instruction presented a theory of her wanton conduct—causing Michaela's death by failing to treat her *resulting* injuries (injuries Joy inflicted). As such, duty to treat is not an element of the offense; failure to treat was merely a theory of how Joy's conduct in causing Michaela's death rose to the level of wanton murder. Consequently, our inquiry, as detailed above, is whether there was sufficient evidence of this theory to support the jury's verdict, an inquiry we previously answered in the affirmative.

## D. **Change of Venue**

Joy argues that the trial court erred by denying a change of venue due to pretrial publicity. It appears that Joy never filed a motion seeking change of venue, but rather "she agreed with Patrick Watkins' motion for a change of venue and adopted his assertions." Regardless of the dubious preservation, we find no error.

On April 14, 2008, Patrick filed a motion for a change of venue on grounds that a fair trial could not be had in Clark County due to prejudicial media attention and, in the alternative, requested individual voir dire on the effect of publicity. In support of the motion, he highlighted numerous newspaper articles documenting Michaela's death and the subsequent investigation. For example, on March 13, 2007, the *Lexington Herald-Leader* published a front page article, entitled "Neighbors Describe Dead Girl's Chronic

Abuse." The article claimed that Michaela was an unhappy child and that several neighbors and relatives stated that Appellants routinely belittled and cursed the child, including a statement by Joy's grandmother that she had once witnessed Patrick smash Michaela's fingers on a table. On March 15, 2007, the *Winchester Sun* carried a front page photograph of Michaela and a makeshift memorial, stating that Appellants had been charged with murder and that they had given inconsistent statements. In all, at least forty stories appeared in the local media.[14]

On April 25, 2008, Patrick filed a supplemental motion for a change of venue. Therein, he described a memorial service that was held on the courthouse lawn on April 17th for child abuse victims. Several Clark County residents attended and, during the service, decorative angels representing abused children were placed on the lawn and left there for a number of days. Two children were selected from the victims to represent the group, one of which was Michaela. People who knew the two children spoke at the service and balloons of Michaela's favorite color were flown at the scene to commemorate her. WKYT of Lexington reported on the service and, on the

---

[14] The motion also made much of the fact that the Grand Jury had attached a statement to its report acknowledging the crime's disturbing nature, which, in its entirety, read:

> The most profound cases involved crimes of violence and neglect, particularly when the victims are young and helpless. We are appalled that some members of our community were capable [sic] causing such great harm. Notwithstanding the horror of the case where a young girl lost her life we were impressed by the response of law enforcement. Winchester Police Detective James Hall has earned our collective respect and appreciation for the way he conducted the investigation into the death of Michaela Watkins.

following day, the *Winchester Sun* headlined the story, carrying Michaela's picture and describing her cause of death.

On May 1, 2008, the trial court held one of two hearings on the motion. Though the trial court concluded that the facts of the case would likely lead any person to naturally conclude that it was a heinous offense, the court was troubled by recent events and stated:

> When I came here to court this morning, the first thing I did at 7:30 and [sic] go out front and . . . there were all the angels of the child victims. . . . And I certainly don't criticize in any fashion any memorial service for the victims, particularly child victims of crime. I think it is entirely proper as all of us know April was child abuse prevention month throughout the Commonwealth of Kentucky. These types of memorial services are held probably in most every county. I think it was extremely unfortunate that this service took place on the front steps of the courthouse less than three weeks from the day this trial was to occur. . . . I think it would be virtually impossible to expect that you can get a jury of people that were not affected by that, particularly when they walk through the front door of the courthouse and look on both sides of the main entrance at the ribbons and the individual angels that are there and have been there two weeks today.

As a result, the trial court granted a continuance and stated that it would consider a change of venue.

The court subsequently denied the motion for change of venue and expressed its desire to try to seat an impartial jury. The court reserved ruling on the possibility for individual voir dire, as it intended to conduct extensive questioning regarding pretrial publicity.

The trial began on September 2, 2008. The court opened by stating to the jury pool that many had probably heard about the case but those who had

27

formed feelings or opinions would likely be unable to hear the case. At the court's request, several jurors approached the bench who felt they could not fairly hear the evidence where they were questioned by the trial court and counsel.[15] As a result, out of the eighty-four potential jurors called, the trial court was forced to excuse fifteen (18%) for cause.

"In Kentucky, the right to an impartial jury is protected by Section 11 of the Kentucky Constitution, as well as the Sixth and Fourteenth Amendments to the [United States] Constitution." *Fugett v. Commonwealth*, 250 S.W.3d 604, 612 (Ky. 2008); *see also Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.") (citations omitted). Though "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved" to be impartial, *Irvin*, 366 U.S. at 722, a juror must have a "mental attitude of appropriate indifference" – a state of mind for which there is no precise test or formula. *Id.* at 724-25.

A corollary to the right to an impartial jury is that a change of venue may be constitutionally required where the jurors' "minds [are] ineradicably poisoned" by prejudicial publicity. *Jacobs v. Commonwealth*, 870 S.W.2d 412, 416 (Ky. 1994); *see Wilson v. Commonwealth*, 836 S.W.2d 872, 888 (Ky. 1992)

---

[15] Appellants did not object to the trial court's questioning nor did they renew their request for individual voir dire. We, therefore, only address the issue of venue. *See Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky. 1971) ("[I]f an objection is made, the party making the objection must insist that the trial court rule on the objection, or else it is waived.").

("[A] change of venue should be granted if it appears that the defendant cannot have a fair trial in the county wherein the prosecution is pending.") (citing Brewster v. Commonwealth, 568 S.W.2d 232 (Ky. 1978)); McCleskey v. Kemp, 481 U.S. 279, 310 n.30 (1987) ("Widespread bias in the community can make a change of venue constitutionally required.") (citing Irvin, 366 U.S. at 717).[16] In order to justify a change of venue on these grounds, a defendant must show that "there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced" him, though it is not enough "that jurors may have heard, talked, or read about a case." Brewster, 568 S.W.2d at 235; see also Wilson, 836 S.W.2d at 888 ("In order for a change of venue to be granted there must be a showing that: 1) There has been prejudicial news coverage, 2) It occurred prior to trial, and 3) The effect of such news coverage is reasonably likely to prevent a fair trial.").[17]

However, we note that "a showing of actual prejudice is unnecessary if the procedure involves such a probability that prejudice will result that it is deemed inherently lacking in due process" – i.e., where the prejudice is implied or presumed from the totality of the circumstances. Brewster, 568 S.W.2d at 235 (citing Estes v. Texas, 381 U.S. 532 (1965)). Though we have not always

---

[16] We note that less drastic approaches may suffice to remedy the risk of prejudicial publicity. See Groppi v. Wisconsin, 400 U.S. 505, 510 (1971) ("One way to try to meet the problem is to grant a continuance of the trial in the hope that in the course of time the fires of prejudice will cool. . . . Another way is to provide a method of jury qualification that will promote, through the exercise of challenges to the venire – preemptory and for cause – the exclusion of prospective jurors infected with the prejudice of the community from which they come.").

[17] The often quoted three-part test from Wilson appears simply an elemental summary of our previous holding in Brewster.

29

carefully reiterated the distinction, "there is clearly established Supreme Court [of the United States] precedent distinguishing between cases involving presumed prejudice – when the setting of the trial [is] inherently prejudicial, – and actual prejudice – when review of both the jury voir dire testimony and the extent and nature of the media coverage indicates a fair trial [was] impossible." *Joseph v. Coyle,* 469 F.3d 441, 468 (6th Cir. 2006) (internal quotation marks omitted) (*quoting Nevers v. Killinger,* 169 F.3d 352, 364 (6th Cir. 1999)) (*abrogated on other grounds by Harris v. Stovall,* 212 F.3d 940, 942-43 (6th Cir. 2000)); *see Murphy v. Florida,* 421 U.S. 794, 788-89 (1975) (contrasting *Irvin,* a case of actual prejudice, to *Rideau v. Louisiana,* 373 U.S. 723 (1963), *Estes,* and S*heppard v. Maxwell,* 384 U.S. 333 (1966), where prejudice was presumed); *see also Nevers,* 169 F.3d at 362-64 (same); *see generally Skilling v. United States,* 130 S.Ct. 2896 (2010).

A change of venue determination is especially appropriate for the trial court's discretion. *See Stopher v. Commonwealth,* 57 S.W.3d 787, 795 (Ky. 2001) ("It is readily acknowledged . . . that wide discretion is, and should be, vested in the trial court when determining a change of venue question.") (*citing Jacobs,* 870 S.W.2d at 412). We have explained that "[g]reat weight is given to the trial court's decision because the judge is present in the county and is presumed to know the situation." *Id.* (*citing Nickell v. Commonwealth,* 371 S.W.2d 849 (Ky. 1963)); *accord Mu'Min v. Virginia,* 500 U.S. 415, 427 (1991) ("Particularly with respect to pretrial publicity, we think this primary reliance

on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.").

Turning to the merits of Joy's allegations, after examining the totality of the circumstances, we do not believe that the trial setting was inherently prejudicial. *See Nevers,* 169 F.3d at 362 ("One type of prejudice is . . . [where] the 'circumstances under which the trials . . . were held' were such that inherent prejudice to the venire should be presumed.") (*quoting Murphy,* 41 U.S. at 798-99). While we agree that the facts of the case were, indeed, heinous and even disturbing, the ensuing publicity was neither so prolific or prejudicial in nature so as to give rise to a presumption of prejudice. *Cf. Rideau,* 373 U.S. at 724 (defendant's confession televised and seen by as many as 97,000 people in a community of 150,000, rendering "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle . . . a hollow formality"); *Sheppard,* 384 U.S. at 353-58 (sensational and inflammatory reporting prior to and during a trial where "the judge gave the throng of newsmen gathered in the corridors of the courthouse absolute free rein"); *Murphy,* 421 U.S. at 799 (describing the *Estes* trial as one "conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment"). While it is true that at least one media account, if not more,

identified prior acts of mistreatment or abuse, this fact, taken alone, does not give rise to an inference of prejudice per se. *See Murphy*, 421 U.S. at 799 (rejecting the idea that "juror exposure to information about a state defendant's prior convictions . . . alone presumptively deprives the defendant of due process"). And while the April 17th memorial service has given this Court pause, we conclude that the trial court, in its sound discretion, rightly dismissed it. There is no indication that the service itself was intended to be, or was, anything more than a legitimate commemoration of Michaela and other child abuse victims brought about not by an acute disgust toward Appellants, but by the month of April, representing child abuse prevention month. *Cf. Jacobs*, 870 S.W.2d at 415 ("The force of adverse publicity gave impetus to the excitement and fostered prejudice among the people of the community. In fact, one of the public fund raising events to aid in Jacobs' prosecution raised $2,922."). To be sure, there is also no indication that any remnants of the memorial persisted on the courthouse lawn beyond the month of May, let alone into the time of the September trial.

Moreover, Joy has not demonstrated a reasonable likelihood that the pretrial publicity actually prejudiced the venire. *See Nevers*, 169 F.3d at 363 ("The other type of prejudice . . . stands for the proposition that absent the 'televised confession amounting to a trial' or 'carnival atmosphere' situations, pretrial publicity that would inherently prejudice the jury pool can be discerned only by reviewing both the extent and nature of the publicity *and* the responses

32

of the prospective jurors in voir dire."). Setting aside what we believe was, given the tragic nature of the case, an unsurprising amount of unremarkable publicity, we find it significant that only fifteen (18%) of the eighty-four potential jurors had to be excused for cause due to bias or preconceptions of Appellants' guilt. This is a figure that falls far short of that usually incident to a finding of prejudice. In reversing the defendant's conviction in *Jacobs*, this Court found "ominous" that 74% (112 of 153) of the jury pool had to be excused for cause due to "fixed opinions of guilt." 870 S.W.2d at 415-16. Similarly, in *Irvin*, the trial court was forced to excuse for cause 62% (268 of 430) of the panel. 366 U.S. at 727. Though not dispositive, it is noteworthy that this Court has affirmed convictions with a significantly higher rate of excusal than that presented here. *See, e.g., Stopher*, 57 S.W.3d at 796 (40% excused for cause). Finally, we note that Joy does not make any contention that the trial court erred in failing to excuse for cause biased jurors,[18] or that any such jurors remained on the panel that decided their case. *Cf. Jacobs*, 870 S.W.2d at 415 ("Of 38 jurors who were accepted by the court, 19 had an initial

---

[18] Joy does not argue that the trial court abused its discretion in failing to excuse for cause certain jurors. *See generally Shane v. Commonwealth*, 243 S.W.3d 336 (Ky. 2007). While it is true, as Joy suggests, that a prospective juror (#69) had formed an opinion in the case, a review of the strike sheets reveals that the juror was apparently excused prior to defense counsel's voir dire. We have also reviewed Joy's related allegation that, when asked by defense counsel, only one juror in the panel indicated they could presume Joy's innocence, and believe it similarly without merit. Defense counsel asked the panel to "please raise your hands if you think Joy Watkins is not guilty" and, after only one juror raised his or her hand, defense counsel moved to strike the entire panel on grounds that they could not presume innocence. After a bench conference, the motion was rightly overruled due to the fact that the question was inaccurately phrased. When defense counsel subsequently rephrased the question, there was no indication that the jurors could not presume Joy's innocent.

33

opinion that Jacobs was guilty. Of those 19 jurors, four sat on the panel that decided the case."); *Irvin*, 366 U.S. at 727 ("Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community . . . was clearly reflected in the sum total of the voir dire examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty.") (citation omitted).

### E. "Irrelevant" Evidence

### 1. Credit Card Reference

Joy next argues that the Commonwealth's reference at trial to obtaining a credit card in the name of Michaela was irrelevant and represented impermissible character evidence under KRE 404(b).

While cross-examining Ashley Clem, the social worker that performed the out-of-county home evaluation on the Watkinses, the Commonwealth attempted to question her regarding a credit card bill issued to Appellants in the name of Michaela. Before the Commonwealth could proceed, defense counsel objected and argued that Clem lacked personal knowledge of the matter, that the bill could not be authenticated, and that it represented hearsay. The trial court sustained the objection and prohibited introduction of the credit card bill but permitted the Commonwealth to ask Clem whether she would have approved a child's placement had the prospective parents applied for a credit card in the child's name. The Commonwealth proceeded, where Clem responded that she would not have approved such a placement.

34

Joy made no other objection and requested no further relief; and consequently, failed to preserve error. As this Court has often repeated, an appellant is "not . . . permitted to feed one can of worms to the trial judge and another to the appellate court." *Neal v. Commonwealth*, 95 S.W.3d 843, 848 (Ky. 2003) (*citing Kennedy v. Commonwealth*, 544 S.W.2d 219 (Ky. 1976)); *see also Craig v. Dean*, 741 S.W.2d 655, 657 (Ky. 1987) ("If a party chooses to state grounds in the absence of a request from the court, he is bound thereby."). On this issue, Joy does not request palpable error review, thus we do not address it further. *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008) ("Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant.") (citations omitted).

## 2. Admission of Table Leg

Finally, Joy alleges that it was palpable error to admit into evidence a wooden table leg found in Appellants' car because the forensic evidence was unable to establish whether it was actually used to inflict Michaela's chest injury. She points out that: no usable prints or fibers were found on the table leg indicating that it was used to strike Michaela; the bruise pattern on Michaela's chest appeared larger than the table leg's actual diameter; and, the medical examiner was unsure what instrument, if any, caused the injury. She argues that she was prejudiced by its admission because the Commonwealth

asserted that the table leg was the likely murder weapon.

Having reviewed Joy's argument, we find no palpable error. According to Dr. Hamon, the table leg found in Appellants' car could have been used to inflict Michaela's chest injury, even though Dr. Rolf testified that a number of different objects could have caused it. This is sufficient.

### E. Patrick's Allegations of Error Likely to Recur on Retrial

We briefly address several of Patrick's allegations to the extent that they are likely to recur on retrial. First, we must again remind the trial court that combination jury instructions are only appropriate when there is evidence to support each distinct theory of culpability. *See Benjamin v. Commonwealth,* 266 S.W.3d 775, 785 (Ky. 2008) (stating that "if the trial judge finds that the evidence is unlikely to support a combination instruction, the court should include separate verdict forms, and if the evidence suffices, the court may use a combination instruction which permits the jury to distinguish upon which theory it bases its findings."). Next, to the extent that the Commonwealth seeks to utilize the reports prepared by the dentist, neuropathologist, and/or the toxicologist, pursuant to *Melendez-Diaz,* Patrick's constitutional rights permit him to cross-examine the authors of the accusatory reports. That Dr. Rolf was present when these reports were prepared does not make this any less violative of the Sixth Amendment. Finally, the credit card evidence does not appear relevant to a murder prosecution, and likely runs afoul of the rules prohibiting character evidence. KRE 404.

## III. CONCLUSION

Therefore, for the above stated reasons, we hereby affirm Joy Watkins' conviction, but we reverse Patrick Watkins' conviction and remand to the trial court for proceedings consistent with this opinion.

All sitting. Minton, C.J.; Abramson, Cunningham, Schroder, Scott, and Venters, JJ., concur. Noble, J., concurs in result only.

COUNSEL FOR APPELLANT, JOY RENEE WATKINS:

Kathleen Kallaher Schmidt
Appeals Branch Manager
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, KY 40601-1109

COUNSEL FOR APPELLANT, PATRICK ALLEN WATKINS:

Roy Alyette Durham, II
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

Perry Thomas Ryan
Assistant Attorney General
Office of Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, KY 40601-8204